CONSUMER UTILITIES RATE ADVOCACY DIVISION
of the Attorney General's Office  *v.*  ARKANSAS PUBLIC
SERVICE COMMISSION, *et al.*

CA 03–222                                    184 S.W.3d 36

Court of Appeals of Arkansas
Divisions III and IV
Opinion delivered May 26, 2004

[Rehearing denied June 30, 2004.]

256

*Mike Beebe*, Att'y Gen., by: *M. Shawn McMurray*, Senior Ass't Att'y Gen., for appellant Consumer Utilities Rate Advocacy Division of the Attorney General's Office.

*Gregory Glisich*, for appellee Public Service Commission.

*Chisenhall, Nestrud & Julian, P.A.,* by: *Lawrence E. Chisenhall, Jr.,* for appellee Arkansas Oklahoma Gas Corporation.

*Perkins & Trotter, PLLC,* by: *Scott C. Trotter,* for appellee Commercial Energy Users Group.

*Brian C. Donahue,* for appellee West Central Arkansas Gas Consumers, Inc.

Sᴀᴍ Bɪʀᴅ, Judge. The Consumer Utilities Rate Advocacy Division of the Attorney General's Office (the AG) appeals from Order No. 20 entered by the Arkansas Public Service Commission. In Order No. 20, the Commission approved a Joint Stipulation and Settlement Agreement in response to Arkansas Oklahoma Gas Corporation's application for a rate increase of $7,236,716. The Settlement Agreement was proposed by Arkansas Oklahoma Gas Corporation (AOG), the general staff of the Arkansas Public Service Commission (Staff), Seminole Energy Services, LLC (Seminole), Commercial Energy Users Group (CEUG), and West Central Arkansas Gas Consumers, Inc. (WCAGC). The AG was also a party to the negotiations leading to the Settlement Agreement but objected to certain provisions of it and urged the Commission not to approve it. On appeal, the AG argues four points for reversal: that the rates put into effect pursuant to the class cost allocation of the Agreement unreasonably discriminate against the residential ratepayers; that the Agreement's provision for pooling services to transportation customers, without imposing a pooling charge, unreasonably discriminates against sales customers; that the Agreement's treatment of lost-and-unaccounted-for gas (LUFG) results in unreasonable rates; and that the Agreement's increase in the dollar amount of the monthly residential customer service charge is not supported by substantial evidence.

On February 12, 2002, AOG filed an application for a rate increase of $7,236,716 based on its purported total revenue requirement of $73,058,046. Intervention was sought and granted to WCAGC, Seminole, and CEUG. The AG also notified the Commission of its intention to participate in the docket. Order No. 1 entered by the Commission established Docket No. 02-024-U to consider AOG's application and set a procedural schedule for testimony to be filed by Staff, AOG, and the intervenors. Fourteen members of Staff, five witnesses for WCAGC, three witnesses for CEUG, and one witness for the AG filed responsive

testimony to AOG's application. Eleven witnesses from AOG filed rebuttal testimony. In September 2002, a joint procedural motion filed by AOG and Staff requested that the "purchase gas cost issues" included in AOG's rate application be severed from the existing docket and transferred to a new docket. No objections were filed in response to the severance motion, and it was granted by Commission Order No. 14. Thereafter, approximately 1,200 pages of rebuttal and surrebuttal testimony were filed by the various parties.

On November 4, 2002, AOG, Staff, WCAGC, CEUG, and Seminole (collectively referred to as the Settling Parties) filed a joint motion seeking the Commission's approval of a Joint Stipulation and Settlement Agreement (Agreement) that they proposed in full resolution of all outstanding issues in the docket. Although the AG participated in the settlement negotiations, it opposed certain provisions of the Agreement and the Commission's adoption of the Agreement.

The Settling Parties filed testimony in support of the Agreement, and rebuttal testimony was filed by the AG. A public evidentiary hearing was also held by the Commission in which it heard testimony and the examination of witnesses in support of and against the Agreement and comments from customers of AOG. On December 11, 2002, the Commission entered Order No. 20, approving the Agreement. The Commission found that the provisions of the Agreement were clearly within the range of the litigation positions of the parties and held that there was substantial evidence of record to support its finding that the Agreement fulfills the Commission's legal responsibilities, represents a just and reasonable resolution of all the issues in the case, and is in the overall public interest. The Commission also ordered AOG to begin tracking the specific costs it incurs in administering and providing pooling service. The AG responded by filing a petition for rehearing, in which it requested that the Commission reverse its ruling in Order No. 20 and reject the Agreement or, in the alternative, reconsider four provisions of the Agreement that it contended result in unreasonable and unlawful rate discrimination among the customer classes and rates that are not supported by the evidence. No written order was entered by the Commission in response to the AG's petition, and on February 28, 2003, the AG filed its notice of appeal.

For its appeal, the AG challenges four separate provisions of the Agreement that it contends require reversal of Order No. 20.

The Commission, AOG, and WCAGC argue in response that the AG's arguments do not have to be considered because the AG, instead of alleging that the total effect of the Agreement is unjust, unreasonable, or discriminatory, focuses on four elements of the Agreement with which it does not agree. The Commission agrees that the AG has "cherry-picked" its issues for appeal and argues that, because the AG is not challenging the order as a whole, it is only necessary for the appellees to show that the Commission made an independent finding, supported by substantial evidence, that the settlement agreement resolves the matters in dispute in a way that is fair, just, and reasonable, and in the public interest. *See Bryant v. Arkansas Pub. Serv. Comm'n,* 64 Ark. App. 303, 307, 984 S.W.2d 61, 63 (1998).

Our standard of review is defined by Ark. Code Ann. § 23-2-423(c)(3), (4) and (5) (Repl. 2002). On review, this court must determine whether the Commission's findings of fact are supported by substantial evidence and whether the Commission has regularly pursued its authority, including a determination of whether the order under review violated any rights of the appellants under the laws or the constitutions of the State of Arkansas or the United States. *Alltel Ark., Inc. v. Arkansas Pub. Serv. Comm'n,* 76 Ark. App. 547, 551, 69 S.W.3d 889, 892 (2002); *Bryant v. Arkansas Pub. Serv. Comm'n,* 64 Ark. App. at 306, 984 S.W.2d at 63. *See also Arkansas Gas Consumers v. Arkansas Pub. Serv. Comm'n,* 354 Ark. 37, 118 S.W.3d 109 (2003). The Commission's statutory authority is broad enough to allow it to consider non-unanimous stipulations; however, in doing so, it must afford a nonstipulating party adequate opportunity to be heard on the merits of the rate application and the stipulation agreed to by some of the parties, and it must make an independent finding, supported by substantial evidence, that the stipulation resolves the issues in dispute in a way that is fair, just and reasonable, and in the public interest. *Bryant,* 64 Ark. App. at 307, 984 S.W.2d at 63; *Bryant v. Arkansas Pub. Serv. Comm'n,* 46 Ark. App. 88, 98, 877 S.W.2d 594, 599 (1994). A stipulation represents a compromise of the parties' positions, and it is the total effect of a rate order that must be reviewed. *Bryant v. Arkansas Pub. Serv. Comm'n,* 57 Ark. App. 73, 89, 941 S.W.2d 452, 461 (1997). If the total effect of a rate order cannot be said to be unjust, unreasonable, unlawful, or discriminatory, judicial inquiry is concluded. *Id.; Bryant v. Arkansas Pub. Serv. Comm'n,* 46 Ark. App. at 103, 877 S.W.2d at 602. Although

we agree that the individual points raised by the AG must be considered in the context of the entire Agreement, we do not agree that this court need only determine whether there is substantial evidence to support the Commission's approval of the Agreement. On review, the appellate court must determine not whether the conclusions of the Commission are supported by substantial evidence but whether its findings of fact are so supported. *Bryant,* 64 Ark. App. at 308, 984 S.W.2d at 63.

*I.*

*Whether the Rates Put into Effect Pursuant to the Class Cost Allocation Approved by Order No. 20 Unreasonably Discriminate Against Residential Ratepayers*

In its initial application, AOG argued that it was entitled to a rate increase of $7,236,716. However, the Commission in Order No. 14 severed the "purchased gas costs" from the present docket. AOG then amended its petition and argued that it was entitled to a non-gas revenue increase of $3,985,835. Staff, however, recommended that AOG receive a non-gas revenue increase of only $1,416,180. The Agreement approved by the Commission provides for AOG to receive a non-gas revenue increase of $1,763,478. This is a 10.53% increase for AOG and will increase residential rates by 7.65%. The AG does not challenge the amount of this revenue increase, but it does challenge the allocation of this increase among the rate classes, arguing that the allocation of the increase unreasonably discriminates against the residential ratepayer.

The AG contends that, under the Agreement, the residential class receives a percentage increase higher than the system average, despite the fact that the Commission specifically found that Staff and AOG were the only parties to perform complete cost-of-service studies,[1] and that these studies advocated increasing the residential rates by a percentage "lower than the system average."

---

[1] "Cost of service" in public utility regulation refers to the total number of dollars required to supply any total utility service (i.e., revenue requirements). It must include all of the supplier's costs, an amount to cover operation and maintenance expenses, and other necessary costs such as taxes, including income taxes, depreciation, depletion, and amortization of the property not covered by ordinary maintenance. Cost of service must include a fair return in order that the utility can maintain its financial integrity, attract new capital, and

The AG contends that, in determining whether rates are reasonable, the Commission must base its decision on the costs to serve customers and, therefore, the Commission is bound by the results of the cost-of-service studies in determining rates. We disagree.

In *Bryant v. Arkansas Public Service Commission*, 50 Ark. App. 213, 237, 907 S.W.2d 140, 153 (1995), this court recognized that a cost-of-service study is merely one of the tools that may be used in rate-design determinations, and that noncost factors can also be taken into consideration. We reiterated this holding in *Bryant v. Arkansas Public Service Commission*, 57 Ark. App. at 73, 941 S.W.2d at 452. In that case, the AG had relied on the individual cost-of-service studies prepared by the expert witnesses and Staff's witnesses for its contention that the Agreement's provision that allowed 98% of the rate increase to be allocated to the residential ratepayers was not supported by substantial evidence. These studies showed that ARKLA was earning a positive rate of return from its residential class and a negative rate of return from some of its industrial classes. In affirming the Commission's decision to approve the Agreement, this court explained that the cost-of-service studies were not the only evidence before the Commission and that the Commission is never compelled to accept the opinion of any witness on any issue before it, nor is it bound to accept one or the other of any conflicting views, opinions or methodologies. *Id.* at 81, 941 S.W.2d at 456. We further noted that the AG had admitted in its brief that the

---

compensate the owners of the property for the risks involved. American Gas Association, *Glossary for the Gas Industry* 13 (4th ed. 1986). *See also Bryant*, 57 Ark. App. at 80 n.2, 941 S.W.2d at 455-56.

A "cost of service study" is made in order to assist in determining the total revenue requirements to be recovered from each of the various classes of service. The amounts to be recovered from each of the classes of service is determined by the management or a commission after study of the various factors involved in rate design. Cost analysis or cost allocation is an important factor in rate design but only one of several important factors. Cost analysis does not produce a precise inflexible "cost of service" for any individual class of service because cost analysis involves judgment in certain cost areas. Its principal value is in determining the minimum costs attributable to each class of service. Other factors that must be considered in rate design are the value of the service, the cost of competitive services, the volume and load factor of the service and their relation to system load equalization and stabilization of revenue, promotional factors and their relation to the social and economic growth of the service area, political factors such as the sizes of minimum bills, and regulatory factors.

*Id.*

Commission does not have to rely entirely on a particular cost-of service-study to decide how rates are allocated per class. *Id.* at 85, 941 S.W.2d at 459. Arkansas Code Annotated section 23-3-114(a)(2) (Repl. 2002) provides that "[n]o public utility shall establish or maintain any unreasonable difference as to rates or services, either as between localities or as between classes of service." However, this statute does not prohibit rate differences; it merely prevents unreasonable rate differences. *Bryant,* 57 Ark. App. at 87, 941 S.W.2d at 460. Whether a rate difference is unreasonable is a question for the Commission. *Id.* This court has repeatedly held that the Commission has wide discretion in choosing its approach to rate regulation, and the appellate court may not advise the Commission as to how to make its findings or exercise its discretion. *Id.* at 78, 941 S.W.2d at 457.

Furthermore, the AG's argument implies that the percentage increase allocated to the residential ratepayers could be appropriate under certain factual situations but emphasizes that those facts are not present in this case. The AG states in its brief that it is only because Order No. 20 accepts unreasonable positions on allocation issues that it allows significant rate reduction for numerous classes, while raising residential rates much more than justified by either the testimony submitted by Staff or AOG. The AG does not explain what it means by "unreasonable positions," and therefore, this court is unable to address this statement, except to note that, throughout this proceeding, significant testimony was developed concerning the effects of bypass on rate allocation and the Commission referenced this testimony in approving the Agreement's cost allocation.

█ Bypass occurs when large industrial customers arrange direct access to a pipeline supplier, allowing that large customer to avoid purchasing gas from the local distribution company, in this case AOG. The resulting effect is diminished contribution to fixed costs, which adversely affects remaining ratepayers with stranded investment, duplicative facilities, and higher rates. *Bryant,* 57 Ark. App. at 81, 941 S.W.2d at 457; *Bryant,* 46 Ark. App. at 92, 877 S.W.2d at 596.

> The threat of bypass has only recently become a significant issue in the natural gas industry. Restructuring in the natural gas industry has changed the function of both local distribution companies (LDCs), such as ALG [Arkansas Louisiana Gas Company], and inter-state pipelines. Traditionally, LDCs and the pipelines provided service

in the same service area with the pipeline engaging in the transportation and wholesaling of natural gas and the LDC providing the retail distribution and sale of the gas. Pursuant to the Federal Entergy Regulatory Commission's (FERC's) recent pro-competitive "open access" policy, LDCs and consumers may now purchase spot-market gas or gas directly from producers and purchase transportation from the interstate pipelines. Transportation has become a significant part of the interstate pipeline's business. Because the LDC maintains the only gas lines connecting an industrial consumer with the pipeline, LDCs have been encouraged to unbundle their services in order to transport gas owned by industrial consumers. A consumer may bypass the LDC, however, by constructing its own lines for local transportation. Bypass of a regulated utility may result in stranded investment, duplicative facilities, and higher rates for remaining customers. In a prior proceeding, the Commission discussed the effects of bypass as follows:

> When larger customers abandon the LDC, the LDC may attempt to shift the resultant lost contribution to its fixed costs to those core customers who cannot afford the option of bypass. We see this as potentially disastrous for the LDC and its core customers and, perhaps, ultimately disastrous even for the bypasser. If bypass is no longer economically advantageous, the bypasser may not have a viable LDC system to which it may return.

Re Transportation, Bypass, and Standby Service in the Natural Gas Industry, 84 PUR 4th 646, 649 (1987).

Bryant v. Arkansas Pub. Serv. Comm'n, 50 Ark. App. at 235, 907 S.W.2d at 152 (1995). This court has previously acknowledged the significant risk that bypass poses to local distribution companies' remaining customers and found that substantial evidence existed for the Commission's approval of a stipulation that allocated 98.3% of a rate increase to the residential class as a just and reasonable response to the threat of bypass. See Bryant, 57 Ark. App. at 88, 941 S.W.2d at 458.

In the case at bar, there was evidence of interclass subsidies among the rate classes and that bypass was a continuing threat. AOG president, Michael Carter, testified in his prefiled testimony that AOG's single largest customer, MacSteel, threatened to bypass AOG in the spring of 1998; through negotiations, bypass was avoided; but that the issue will arise again. He also

testified that Southwestern Glass attempted to bypass AOG's system but is currently in bankruptcy.

WCAGC witness Jerrell Clark, testifying in support of the Agreement, stated that the Commission has encouraged eliminating, or at least not exacerbating, interclass subsidies in previous AOG decisions and that objective was followed in obtaining this Agreement. He stated that the new rates based on the agreed cost-of-service methodologies should have the effect of mitigating the risk of bypass, although they do not eliminate interclass subsidies. He also stated that the benefit of preventing bypass by individual and large commercial customers inures to all ratepayers because they will avoid cost shifts.

Adrian Moorehead, who filed testimony on behalf of WCAGC, testified that Commission Order No. 23 (Supplemental Order on Remand) in Docket No. 96-420-U found that AOG's existing rates contained considerable cross-subsidies among the classes of ratepayers with AOG's industrial customers providing subsidies of $1.8 million per year and AOG's residential customers receiving subsidies of $1.4 million per year. Moorehead testified that the Commission found that these types of subsidies should be eliminated and that, while the stipulation in Docket 96-420-U made significant progress in eliminating a substantial part of the subsidies, the Commission should eliminate the remainder of the subsidies in this case.

Additionally, evidence was presented that, although the Agreement allocates to the residential class an increase "higher than the system average," the residential increase is lower than the increases for three of the other classes: small commercial, larger commercial, and federal housing. Staff witness Robert Booth testified that the average total impact on the residential class is $18.06 per year, the highest monthly impact is $2.00, and the average monthly impact is $1.51.

In approving the Agreement in Order No. 20, the Commission referred to testimony and exhibits to support its finding that the Agreement achieved a balanced cost allocation among the various customer classes and furthered the Commission's policy of eliminating inter-class cost subsidies. The Commission held:

> The Agreement allocates a smaller proportion of AOG's cost of service to small customers than would the cost of service allocation contained in AOG's existing rate structure. Order No. 15 which

approved the settlement agreement in AOG's last rate case in Docket No. 96-420-U stated that "it was the position of AOG, Staff, and WCAGC that AOG's rates should be redesigned to eliminate interclass subsidies and that AOG's rates be set based upon the cost of providing service to each class." (Order 15, pg 2) In the current case, while each class was basically assigned equal rates of return, Mr. Booth testified that there still remain some subsidies in the industrial customer rate. (Tr. 1339-1340) Also, comparing this docket to AOG's last rate case, the overall rate increase in total revenue requirement is only 2.42%, with the residential class receiving a revenue requirement increase of only 2.93%. The Agreement also embodies overall and residential increases far less extreme than AOG's original case (10.99% system and 10.21% residential). Regarding the allocation of mains, the Agreement's 42% customer and 58% demand allocation, while higher than Staff's 34-66 allocation recommendation, is still more favorable than AOG's 50-50 customer/demand allocation.

It has been the longstanding policy of this Commission that each rate class pay their cost of service. The Commission continues to hold that inter-class subsidies should be eliminated in order to reduce the possibility of uneconomic bypass of AOG's system by its larger customers. Such uneconomic bypass eventually increases the cost to serve all remaining customers. Therefore, the Commission rejects the AG's cost allocation proposal. The Commission finds that the Agreement achieves a balanced cost allocation among the various customer classes and furthers the Commission's policy of eliminating inter-class cost subsidies.

Order No. 20 at 16-17.

We find that substantial evidence existed for the Commission's approval of the Agreement's allocation of the rate increase to the residential class and that the AG has failed to show that the allocation to the residential ratepayer is unjust, unreasonable, or discriminatory.

## II.

*Whether the Stipulation's Provision that Provides Pooling Services to Transportation Customers Without Imposing a Pooling Charge Unreasonably Discriminates Against Sales Customers*

The AG argues that providing pooling services to transportation customers without charging them for the expense of pro-

viding such service unlawfully discriminates against the sales customers who do not receive any benefit from the service. The basic thrust of the AG's argument is that, because only transportation customers can avail themselves of AOG's pooling service, sales customers, which include all residential customers, derive no benefit from it, and that it is therefore unfair to make them pay for the costs of administering the service.

In AOG's initial rate application, it proposed eliminating its pooling service to transportation customers entirely; however, several of the parties including Staff objected to this proposal.

CEUF witness Daniel Frey of Seminole described pooling service as

> a service whereby a natural gas supplier, such as Seminole Energy, can aggregate supplies into a single "pool" and then sell gas to customers from the pool. The purpose of the pool is to use supply and demand diversity to mitigate the effects of variations on both ends of the pipe. For example assume that a customer has 1000 MMBtu of load each day. In order to serve that customer without a pool, Seminole Energy would need to line up multiple receipts points, wells and pipeline interconnects, and specifically designate them to serve the customer. Seminole Energy would then need to engage in a similar matching of supply to load for each of its other customers.

> [With pooling] Seminole Energy can contract for the aggregate amount of supply it needs to serve all of its customers and put all of that gas into a single pool. Then, the Seminole Energy is able to allocate the gas out of the pool to each of its customers based upon each customer's load. This gives Seminole Energy the benefit of diversity on both the supply and the demand end. As individual wells vary in production over time, it tends to balance out. The same is true for customers. Pooling gives the supplier the benefits of diversity, as well as the administrative convenience of allocating gas to customers from a single supply source.

Frey also testified in support of continuing and expanding pooling service:

> Pooling is vital for suppliers to use gas from individual wellheads to serve customers. For this reason, most pipelines connected to production areas offer some form of pooling. Without pooling,

serving customers on AOG's system would be an administrative nightmare and, as a result, much more expensive. In fact, AOG itself engages in a form of pooling when it supplies sales gas customers, in that it aggregates all of its supplies and serves all of its customers without a direct matching of supply and demand. If the Commission were to eliminate pooling for transportation customers, it would deny transportation customers access to competitively priced gas supplies. AOG's proposal to eliminate pooling service for transportation customers, or to impose unjustified costs and further limitations on the service, will force Seminole Energy off the AOG system as a competitor for on-system gas supplies, and will be detrimental to AOG's transportation customers. It will also be detrimental to other customers to the extent that it reduces the competitive market for selling gas on AOG's system. The Commission should foster the development of a competitive on-system gas supply market in AOG's area by directing AOG to remove unreasonable constraints.

Staff witness Robert Booth also supported the continuation of the pooling system, stating that the Pooling Service Agreement (PSA) is necessary to facilitate transportation of natural gas for large industrial transportation customers.

Martin Waelder of Waelder Oil and Gas testified that his company's gas production was switched to AOG from Reliant Energy after AOG's last rate case, which made it possible for marketers to create pools and for large industrial customers to transport their gas. He stated that "we still feel this is an attractive market" and that "keeping the market attractive to producers should benefit all consumers on the system as far as the commodity component of their gas bill."

Timothy Staley testified on behalf of CEUG:

First, it is important to understand the definition and benefits of a Pooling Service option. This option allows customers and their suppliers to aggregate loads for the purposes of load management. This is a significant benefit for customers or suppliers, as it is always easier to manage a larger volume than a smaller volume (because individual customer imbalances are typically offsetting). The Company effectively pools the volumes of the retail rate classes and the LIS rate class for the purposes of managing their combined supplies. This is evidenced by the fact that the Company has been able to effectively manage imbalances on its system without having to construct on-system storage facilities. This could only be achieved

through aggregate load management. This has resulted in deferred investment by the Company and lower rates for retail sales customers and LIS customers.

Although these parties maintained that AOG's pooling service was beneficial to all of AOG's customers, the AG, referencing the testimony of AOG witness Michael Callan, disputed that this service was of any benefit to residential customers. Callan testified:

> It is surprising to see the Staff take this position with respect to pooling service, especially when Staff's position works to the benefit of those customers who have the ability and expressed desire to provide natural gas supplies for themselves; and works to the detriment of residential and commercial customers who do not have that ability.

The AG argues that, because the evidence shows that pooling only benefits transportation customers, the Commission erred in not requiring the transportation customers to pay the estimated cost of $100,000 for administering this service.

Callan confirmed that $100,000 would be a good estimate of the cost to AOG for providing pooling service but also stated that the administrative costs about which the AG is concerned are carried on by a number of AOG employees who would still be doing most of their same functions even if AOG were not providing pooling service. He admitted that, according to AG witness Marcus's testimony, three-fourths of the costs were going to sales customers but also testified that no loss of employees would result if pooling for whatever reason was terminated by the company as a result of this proceeding.

Staff witness Robert Booth disagreed with the $100,000 figure and testified that Staff did not have information to confirm the AG's estimation that the cost of pooling is $100,000 per year or that the administration of pooling service requires one full-time equivalent employee. He stated:

> The fact of the matter is the administrative costs associated with pooling are not known at this time.
>
> To properly determine the cost of AOG providing a pooling service would require that AOG's cost be reviewed and tracked. While Mr. Marcus points to this one expense as being a subsidy, other parties could argue that other expenses are being shared by pooling customers that likewise should be more fully assigned to other customers.

> Finally, the company's indicated informally that it intends to track the costs associated with AOG's pooling service. While I don't believe there's enough information currently to warrant a pooling fee, nothing in this agreement precludes Staff from continuing to evaluate this issue in the time between this case and AOG's next rate case.

In Order No. 20, the Commission found that the AG and the Settling Parties have confirmed that pooling customers should be charged the appropriate costs incurred by AOG in providing pooling service on their behalf. The Commission also agreed with AOG and Staff that, while AOG had begun to review the source of supply and number of customers involved in the pooling processes, AOG did not have sufficient information at this time to develop a cost-based pooling rate and, therefore, the Commission could not adopt the AG's recommendation to impose an estimated pooling charge. The Commission then ordered AOG to begin tracking and quantifying the costs of pooling so that a cost-based pooling rate could be developed in time for AOG's next rate case. Order No. 20 at 13.

The AG cites *Cullum v. Seagull Mid-South, Inc.*, 322 Ark. 190, 907 S.W.2d 741 (1995), for the proposition that the law prevents a utility from charging its customers for costs that are not incurred in providing utility service. The facts in *Cullum*, however, are distinguishable from the case at bar. *Cullum* did not involve utility costs being charged to a particular group of customers who may not have benefitted from the particular service, but the cost of developing and producing oil and gas, which the supreme court held was an expense associated with the private business of the utility and could not be passed on to the ratepayers. This is not the situation here. The evidence clearly established that whatever costs AOG incurs in providing pooling service, providing pooling is a utility service that is beneficial to some, if not all, of AOG's customers.

Based on the tentative evidence before the Commission regarding the amount of costs incurred in providing pooling service, we do not agree that the Commission acted arbitrarily in refusing to impose a charge on AOG's transportation customers and choosing instead to require AOG to begin tracking its costs so that a cost-based rate could be developed in AOG's next rate case. In *Bryant v. Arkansas Public Service Commission,* 57 Ark App. at 73, 941 S.W.2d at 452, this court approved a stipulation where the

Commission required Arkla to keep and provide detailed justification records so that the Commission could consider at Arkla's next rate hearing all factors and circumstances bearing on the issue of corridor rates. This court stated:

> The Commission took the steps that it deemed necessary to determine whether the allocated revenues should be recovered. We have repeatedly held that the Public Service Commission has wide discretion in choosing its approach to rate .regulation, and the appellate court does not advise the Commission on how to make its findings or exercise its discretion. *Bryant v. Arkansas Pub. Serv. Comm'n*, 50 Ark. App. at 219.

*Id.* at 90, 941 S.W.2d at 461.

## III.

*Whether the Treatment of Lost-and-Unaccounted-for Gas Approved by Order No. 20 Results in Unreasonable Rates, or is Arbitrary and Capricious*

The AG contends that the Agreement's treatment of lost-and-unaccounted-for gas (LUFG)[2], approved by Order No. 20, will benefit transportation customers but will provide only minimum benefits to sales customers while resulting in .higher prices to them. The AG does not explain the nature of the error in the Agreement's treatment of LUFG but instead faults the Commission's reliance on the testimony of CEUF witness Timothy Staley, contending that his testimony is contradicted by his own exhibit, TPS Oral Testimony Exhibit 1, Line 64. The AG argues:

---

[2] LUFG is the difference between the total volume of gas purchased from all sources and the volume delivered and billed to customers. *Bryant,* 46 Ark.App. at 102 n.3, 877 S.W.2d at 602.

> *Gas line loss.* The difference between the input of gas into the system and the output chargeable to ratepayers as unaccounted-for volume or "line loss." The loss may be attributable to line leakage, inaccurate measurement reading, or differences in pressure throughout the system. The allowance must be reasonable, and periodically revisited to make certain ratepayers are not overpaying for this factor. A reduction in loss factor, all else remaining equal, results in the company's obtaining a greater margin from existing rates, which offsets the need for a rate increase. Absent any adjustment, and again all else remaining equal, the company could realize the equivalent of a net revenue increase.

Leonard Saul Goodman, *The Process of Ratemaking I,* 328 (Public Utility Reports, Inc. 1998).

Mr. Staley's Exhibit is the only substantial evidence (other than that presented by the AG's witness William Marcus) on this issue. Neither his Exhibit nor Mr. Marcus' testimony or exhibits support the Commission's holding that rates for sales customers will be lower under the Stipulation, approved by Order No. 20. Instead, TPS Oral Testimony Exhibit 1 establishes beyond dispute that transportation customers receive 100% of the benefits of the Stipulation's treatment of LUFG, while other customers will likely only see rate increases. This is unreasonable rate discrimination, and this provision of Order No. 20 should be reversed.

The AG points out that, although Ark. Code Ann. § 23-3-114(a)(1) does not require that the rates charged to different customer classes be the same, this section does prohibit "unreasonable rate differences among the classes." In determining whether rates are reasonable, the AG argues that the Commission *must* base its decision upon the costs to serve customers. However, as we noted in the first issue, the Commission has wide discretion in choosing its approach to rate regulations and the appellate court does not advise the Commission how to make its findings or exercise its discretion. *Bryant*, 57 Ark. App. at 78, 941 S.W.2d at 455. A utility's costs in serving its customers is not the sole criterion that the Commission considers in determining whether rates are reasonable. In *Bryant v. Arkansas Public Service Commission*, 50 Ark. App. at 213, 907 S.W.2d at 140, this court affirmed a Commission decision where it had balanced both cost and noncost factors and had made choices among public policy alternatives. Different rates are certainly related to the cost of service, but "that concept involves a 'myriad of facts' and other considerations are also proper." *Id.* at 238, 907 S.W.2d at 143 (quoting *Arkansas Elec. Energy Consumers v. Arkansas Pub. Serv. Comm'n*, 20 Ark. App. 216, 224, 727 S.W.2d 146, 151 (1987)). Whether a rate difference is unreasonable is a question for the Commission. *Bryant*, 57 Ark. App. at 87, 941 S.W.2d at 460. "The Commission's action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis, and something more than mere error is necessary to meet the test." *Alltel*, 766 Ark. App. at 551, 69 S.W.3d at 892; *Bryant v. Arkansas Pub. Serv. Comm'n*, 55 Ark. App. 125, 135, 931 S.W.2d 795, 800 (1996).

In his surrebuttal testimony, Marcus stated that there are two separate issues associated with LUFG — how to forecast it and to what extent LUFG should be charged to off-system transportation customers. He argued that there was a potential linkage between

the allocation of LUFG to transportation customers and the cost of gas to sales customers and that changes in LUFG allocation could ultimately affect prices of gas paid by sales customers. He recommended that the Commission incorporate the record on this issue into Docket No. 02-179-U and, in the interim, preserve the status quo by maintaining the current LUFG treatment.

At the public hearing on the consideration of the Agreement, Staff's attorney Gregory Glisich responded to Marcus's recommendation that the treatment for LUFG should be postponed for consideration in the pending gas-cost docket, arguing that the AG did not oppose the motion that led to the establishment of the gas-cost docket, which expressly reserved the LUFG issue for the pending docket. He also described how the settlement agreement addressed the problem of LUFG, stating that, when AOG renegotiates its off-system transportation contracts in the future or enters into new contracts, AOG will recover roughly through each contract or instead will impute losses so that no customer pays more than its appropriate share of that expense.

Scott Trotter, attorney for CEUG, explained that the Agreement imposes caps on AOG's recovery of LUFG that are more aggressive than what CEUG proposed and which seemed to go along with AG witness Marcus's testimony that recovery of LUFG might be appropriate with reasonable caps. He also noted that the Agreement requires that LUFG volumes be allocated to transportation customers.

On appeal, the AG argues that the Commission relied on the testimony of CEUG witness Tim Staley, who testified that sales customers will not see higher rates as a result of the Agreement's treatment of LUFG, for its holding that the AG was not able to show that sales customers will be worse off under the Agreement's treatment of LUFG. The AG contends that this finding is not supported by substantial evidence because Staley's testimony is contradicted by Staley's own exhibit. The AG argues that Line 64 of Staley's exhibit, TPS Oral Testimony Exhibit 1, shows that, under one of Staley's own assumptions, the unit cost of gas inclusive of LUFG and CUG (company use gas) recovery would have been \$5.0832 under AOG's application, but under the Agreement, the cost for the period 12/2002-12/2003 will be \$5.0991, which is higher than AOG's application. It also notes that the cost from 01/2004-12/2004 will be \$5.0890 — still higher. The AG argues that this exhibit convincingly demonstrates that, if

one of Staley's assumptions comes true, sales customers will see higher rates as a result of the Agreement's treatment of LUFG.

At the hearing, Staley explained that TPS Oral Testimony Exhibit 1 is a work paper that he developed to try to analyze the impact of several different scenarios. He stated that there had been a lot of discussion regarding the impact of the settlement's LUFG and CUG on the cost of gas to customers compared to what is currently in effect and that what he had done on his work paper was evaluate the settlement versus the LUFG and CUG recovery included in AOG's original application. He stated that he tried to portray not only a recent cost of gas but also a worst-case scenario for the retail class customers and that basically what appears on his work paper is the worst-case allocation of LUFG and CUG. He also emphasized that recent estimates from AOG indicated that the numbers are likely to be significantly less than those caps, which means that the relative impact under the Agreement is going to be much better. He concluded that the actual long-term impact of the Agreement would give a lower cost of gas to the retail rate class of customers even under a worst-case scenario.

In Order No. 20, the Commission addressed the AG's objections to Staley's testimony:

> In reply to Mr. Marcus' claim that Mr. Staley's testimony supports the AG's contention that sales customers will be harmed by the Agreement's treatment of LUFG, Mr. Staley testified that Mr. Marcus chose to quote out of context only a portion of his testimony and omitted that part of his testimony that states that the LUFG and CUG caps will reduce costs annually over the next two years, providing even more benefit to retail customers. Mr. Staley also introduced a work paper he prepared to support his conclusion that as the LUFG and CUG percentages are ratcheted down, any punitive impact on sales customers will be more than offset and result in a better cost of gas to sales customers. (Tr. 1385-1401)

> With regard to Mr. Marcus's charge that sales customers will pay more for gas under the Agreement's treatment of LUFG, Mr. Staley, using the work paper he introduced during the hearing, has shown, even under a worse case scenario [footnote omitted], the actual long-term impact of the Agreement will give a lower cost of gas to retail sales customers as the LUFG/CUG caps are ratcheted down over the three years contemplated in the Agreement. (Tr. 1393-1394) Mr. Staley's work paper shows at Line 64 that in 2005, the third year of the Agreement, the Agreement will produce a lower

cost of gas, which would be $5.0794 per Mcf compared to AOG's original application cost of gas of $5.0832 per Mcf. Mr. Staley also pointed out that recent estimates from AOG indicate that the LUFG amounts will likely be far less than the capped LUFG amounts, producing much better results than the work paper shows. (Tr. 1391) The AG, neither in his cross-examination of Mr. Staley (Tr. 1395–1400) nor by any calculation of his own, was able to show, as Mr. Marcus claimed, that sales customers will be worse off under the Agreement's treatment of the LUFG/CUG issue. Neither was the AG able to refute Mr. Staley's conclusion that sales customers will receive a lower cost of gas even under a worse [sic] case scenario. Therefore, the Commission accepts the Agreement's provisions on this issue.

Order No. 20 at 14–15.

▪ The burden was on the AG to show that the Commission's approval of the Agreement's treatment of LUFG was not supported by substantial evidence. For purposes of determining whether an administrative agency's decision is supported by substantial evidence, the question on review is not whether the testimony would support a contrary finding but whether it supports the finding that was made. To do this an appellant must show that the proof before the Commission was so nearly undisputed that fair-minded persons could not reach the conclusion the Commission did. *Southwestern Bell Tel. Co. v. Arkansas Pub. Serv. Comm'n,* 68 Ark. App. 148, 5 S.W.3d 484, 491 (1999). Evaluation of testimony is for the Commission, not the courts; to hold that testimony does not constitute substantial evidence, this court must find the testimony has no rational basis. *Bryant v. Arkansas Pub. Serv. Comm'n,* 57 Ark. App. at 85, 941 S.W.2d at 459.

▪ We find that there is substantial evidence to support the Commission's approval of the Agreement's treatment of LUFG and affirm on this point.

*IV.*

*Whether the Dollar Amount of the Monthly Customer Service Charge Approved by Order No. 20 is Not Supported by Substantial Evidence*

The AG's final point concerns the Commission's approval of the monthly customer service charge included in the Agreement. The Agreement increased this charge from $9.00 to $9.90 for

residential customers. The AG argues that the $9.90 customer service charge for residential customers will be the highest service charge for any Arkansas gas utility, is higher than other gas utilities in the region, and that this increase is not supported by substantial evidence.

The customer service charge is a fixed amount to be paid periodically by the customer without regard to demand or energy consumption. *Glossary for the Gas Industry* at 14. At the hearing, Michael Callan for AOG testified in support of the $9.90 charge:

> As a part of AOG's application, AOG performed a cost of service study. AOG's numbers indicated initially that the true customer charge should be approximately $16.75 per month. Staff did its own analysis. I think Staff's numbers actually came up with somewhere in the $12.30 range is what the cost of study would indicate. Obviously ratemaking principles, if you took them in a vacuum, you would want the appropriate customer charge to be set as high as possible.
>
> In the past there have been concerns at the Commission and at the company on volatility. Obviously, a larger customer charge does in some way lessen volatility on residential customers. However, there are public policy reasons for not going that high that fast. That is why the company believed the appropriate increase was 10 percent.
>
> We agreed to a $9.90 customer charge which is a lot less of a rate shock on a residential customer. At the same time, it's a delicate balancing act and I'm not sure anybody has the appropriate answer of how to balance volatility, true cost of service, and the negative impact these type of charges have on especially fixed income residential and small business customers.

The AG disputes the "customer-related costs" that AOG used in its cost-of-service study to determine its customer service charge. The AG claims that AOG is including costs that are inappropriate for determining the residential customer service charge. Its sole authority for this claim is the testimony and exhibits presented by Staff witness Karen Fricke in another docket involving a rate increase for ARKLA.

In Docket No. 01-243-U,[3] Fricke, in her prepared testimony, testified that her Exhibit KF-3 supported a customer charge of $9.00 for the residential class. Fricke did not use the phrase "Total Customer Specific Costs" in her testimony, but on Exhibit KF-3 and surrebuttal Exhibit KF-8, this phrase appeared at the end of a column that included costs for meters, services, meter installation, "house req. and installation," and customer accounts. Relying on these two exhibits, the AG argues that these five cost items, which compose the column labeled "Total Customer Specific Costs," are the only costs that AOG and Staff should have considered in calculating the customer service charge. The AG summarizes that, had the residential customer service charge in the present docket been calculated using only these five cost items, the charge would be $6.56 and, therefore, the evidence does not support the $9.90 charge included in the Agreement.

The AG does not cite this court to any authority that only the five cost items listed on Fricke's exhibits in a previous unrelated docket can be considered in computing the customer service charge. Instead, the AG relies entirely on the word "total" that appears at the bottom of a column of figures in Fricke's exhibits. At the hearing, Staff witness Robert Booth explained why the cost factors used in the ARKLA docket were different than the present docket:

> Staff's recommendation in the ARKLA case was limited to the minimal level of customer related cost because of the significant rate impact. The minimum level of customer related costs set forth in Staff's case was set forth in Staff's case to explain the basis for the level of increase, not to identify all customer related costs which could be recovered through the customer charge.

> Customer related cost, including those costs necessary for the company to provide gas regardless of an amount of gas delivered, including such costs as plant in the ground, standing ready to provide service, meter reading and billing are included in the customer charge.

The AG claims that Booth's testimony "does not square with the plain words of Ms. Fricke's Testimony in Docket No. 01-243-U," and contradicts her Exhibits KF-3 and KF-8 in that

---

[3] Consolidated with Docket No. 01-266-U.

docket, as both refer "to 'Total Customer Specific Costs.'"
However, the Commission disagreed:

> The AG's objection that Staff has used a different customer charge calculation methodology in this case than it did in the Arkla case is of no consequence. Neither the Staff nor the Commission are bound to use the same methodologies in different cases. Further, the settlement agreement in the Arkla case at Section 7D specifically provides that the parties thereto were not bound, from a precedential standpoint, from taking a different position on any issue in any subsequent proceeding. The AG was a signatory party to the Arkla settlement agreement which was approved by the Commission.

Order No. 20 at 18.

In *Southwestern Bell Telephone Co. v. Arkansas Public Service Commission,* 267 Ark. 550, 567, 593 S.W.2d 434, 445 (1980), the supreme court emphasized that it could not require the Commission to take the same approach to every rate application, or even to consecutive applications by the same utility, when the Commission, in its expertise, determines that its previous methods are unsound or inappropriate to the particular application.

> In effect, Bell is asking us to apply the doctrine of res judicata to require PSC to apply the methodology used by it in entering the 1975 order. But res judicata has little application to regulatory action by an agency in fixing utility rates, because rate-making is a legislative, not a judicial function. It has been held that every rate order may be superseded by another, not only when conditions change, but also when the administrative understanding of the same conditions changes.

*Id.* at 567, 593 S.W.2d at 445 (citations omitted).

There is substantial evidence to support the Commission's approval of the $9.90 cost-of-service rate for residential customers. Michael Callan testified that AOG's cost-of-service study supported a rate increase of $16.75 per month and Staff's analysis supported a $12.30 range. Staff witness Patti Kelly testified that Staff's cost of service indicated that the customer charges for the residential and small commercial classes do not recover all customer-related costs but recommended that their rates be increased by no more than ten percent. This court has repeatedly held that the appellate court views only the evidence

most favorable to the appellees in cases presenting questions of substantial evidence, and the burden is on the appellant to show a lack of substantial evidence to support an administrative agency's decision. *Bryant*, 57 Ark. App. at 79, 941 S.W.2d at 455. To establish an absence of substantial evidence to support a decision, the appellant must demonstrate that the proof before the administrative tribunal was so nearly undisputed that fair-minded persons could not reach its conclusion. *Id.* The question on review is not whether the testimony would have supported a contrary finding but whether it supports the finding that was made. *Id.*; *Arkansas Elec. Energy Consumers v. Arkansas Pub. Serv. Comm'n*, 35 Ark. App. 47, 72, 813 S.W.2d 263, 277 (1991).

Affirmed.

HART, GLADWIN, VAUGHT, BAKER, and ROAF, JJ., agree.