## CONSUMERS UTILITIES RATE ADVOCACY DIVISION & West Central Arkansas Gas Consumers, Inc. *v.* ARKANSAS PUBLIC SERVICE COMMISSION, et al.

CA 06-379 258 S.W.3d 758

Court of Appeals of Arkansas
Opinion delivered June 13, 2007

*Mike Beebe*, Att'y Gen., by: *Lori L. Burrows*, Ass't Att'y Gen., and *M. Shawn McMurray*, Sr. Ass't Att'y Gen., for appellant Consumer Utilities Rate Advocacy Division.

*Denise Baker* and *Brian C. Donahue*, for appellant West Central Arkansas Gas Consumers.

*Paul J. Ward* and *Connie Griffin*, for appellee Arkansas Public Service Commission.

*Chisenhall, Nestrud & Julian, P.A.*, by: *Lawrence L. Chisenhall, Jr.*, for appellee Arkansas Oklahoma Gas Corporation.

WENDELL L. GRIFFEN, Judge. This appeal concerns a rate application filed by Arkansas Oklahoma Gas (AOG) on February 1, 2005, in which it sought an increase of non-gas rates of

almost $6.9 million. Docket No. 05-006-U was established by the Commission to consider its application. The parties to the proceeding included appellant West Central Arkansas Gas Consumers (WCAGC), appellant Consumer Utilities Rate Advocacy Division of the Attorney General's Office (AG), the general staff of the Arkansas Public Service Commission (Staff), Commercial Energy Users Group (CEUG), and Seminole Energy Services, LLC (Seminole). All of the parties pre-filed direct testimony and surrebuttal testimony. An evidentiary hearing was held on November 8, 2005, and a public-comment hearing was held in Fort Smith on November 17, 2005. On December 1, 2005, the Commission issued Order No. 7, a seventy-two-page document in which the Commission made extensive findings of fact and approved an overall rate increase of $4,404,060. On December 15, 2005, the Commission entered Order No. 8 that approved the revised tariffs submitted by AOG in compliance with Order No. 7. Petitions for rehearing of Order No. 7 were filed by the AG, AOG, CEUG, and WCAGC; the AG and WCAGC also requested rehearing of Order No. 8. The Commission entered Order No. 10 on January 17, 2006, for the sole purpose of further consideration of the rehearing petitions, but, on March 10, 2006, it denied the requests in Order No. 11. The AG and WCAGC have both appealed from the Commission's orders in this docket, raising separate issues for our review.

### AG Issue I — Failure to Consider Public Comments

We begin with the issues raised by the AG. The AG argues for its first point that the Commission's failure to consider the Fort Smith public comments before issuing Order No. 7 violated Arkansas law and ratepayers' rights. The AG is referring to a hearing held in Fort Smith to receive public comments concerning AOG's petition for a rate increase, pursuant to Ark. Code Ann. § 23-2-103(b) (Repl. 2002), which provides:

> When a formal proceeding to consider a general change or modification in the rates and charges of a public utility has been initiated before the commission, the commission shall conduct a hearing for the purpose of receiving public comment in an appropriate location or locations within the service territory of the public utility.

The hearing was conducted by Administrative Law Judge Ted Thomas of the Commission on November 17, 2005, and a court reporter

was present to transcribe the hearing. None of the commissioners were in attendance; however, Administrative Law Judge Thomas told those present that the hearing was being transcribed and would be part of the record and available to the commissioners to review. Eight ratepayers testified at the hearing, and a letter from an absent ratepayer was also read. The Commission issued Order No. 7 on December 1, 2005, four days before the transcript of the Fort Smith hearing was filed with the Commission on December 5, 2005.

The AG then petitioned for rehearing of Order No. 7, arguing, among other things, that the Commission's failure to include the public comments in the record before issuing Order No. 7 merited reconsideration of the bases for the substantial residential rate increase. The AG argued that section 23-2-103(b), which requires that a public hearing be held, was designed to give ratepayers an opportunity to present their concerns regarding potential increases in utility bills and that the failure to include these comments in the record violates Arkansas law and discredits the thoughts and opinions of the people who will be most directly impacted by Order No. 7 mandates.

The Commission responded to this argument in Order No. 11:

> The AG implies that Order No. 7 is violative of Arkansas law because it was issued prior to receipt by the Commission of the transcript of a public comment hearing conducted on behalf of the Commission by a Commission Hearing Officer in Ft. Smith, Arkansas on 17 November 2005. Order No. 7 was issued on 1 December, 2005. The transcript of the Ft. Smith public comment hearing was not filed with the Commission until 5 December 2005. Before ruling on the AG's objection on this issue a review is required of the Arkansas laws controlling the Commission's investigation of, conduct of public hearings on, and final ruling on a utility company's application for a general rate increase.
>
> From the date a general rate increase application is filed, in the instant case 1 February 2005, the Commission has a maximum of ten (10) months in which to complete its investigation, conduct all required evidentiary and public comment hearings, and issue its final rate case ruling. Unless the Commission issues an order suspending the operation of proposed new rates within thirty (30) days of the date the proposed new rates were filed by the utility, the proposed new rates will go into effect on the 30th day after they

were filed. However, if the Commission issues an order suspending the proposed new rates within the allowed thirty (30) days then it may take an additional nine (9) months in which to investigate and issue its final rate case ruling on the utility's application for a general rate increase.

In the instant case the Commission timely issued its suspension order on 3 March 2005 and established the procedural schedule for this case. In addition to a schedule for the filing of written testimony and exhibits by the official parties in this case, the suspension order set a public evidentiary hearing on AOG's rate increase application to be conducted in its Little Rock, Arkansas office beginning on 8 November 2005, and a public comment hearing to be conducted in Ft. Smith, Arkansas on 17 November 2005. By operation of law the Commission was required to issue its final rate case order no later than 1 December, 2005. Failing to issue its final rate case order by 1 December 2005 would have allowed AOG the opportunity to immediately place into effect its full rate increase request. AOG had requested an increase in non-gas rate revenues of approximately $7 million. The Commission's final rate case order issued on 1 December 2005 authorized an increase in non-gas rate revenues for AOG of only $4.4 million. Had the Commission not issued its final rate case order on 1 December 2005 AOG could have increased its rates by approximately $2.6 million more that the Commission allowed.

The Commission regrets that the transcript of the Ft. Smith public comment hearing was not available to the Commission until 5 December 2005, four (4) days after the Commission's statutory deadline of 1 December 2005 to issue its final rate case order. Unfortunately in this case the Commission's court reporting contractor failed to deliver the public comment transcript on-time and in accordance with its contract. The transcript should have been delivered to the Commission by the court reporter within ten (10) calendar days of the public comment hearing, i.e. on or before 27 November 2005. Had the transcript been delivered on time the Commission would have had time to read and consider the comments of AOG's customers who spoke at the public hearing prior to the issuance of its 1 December 2005 final rate case order.

However, the Commission did have the benefit of having received and considered the public comments of many of AOG's customers prior to the issuance of its final rate case order on 1 December 2005. Prior to the issuance of its final order the Com-

mission had received and considered twenty-four (24) public comments regarding this case. Those public comments were similar in both tone and content to the nine (9) public comments offered during the Ft. Smith public comment hearing. Further, on rehearing the Commission has had the opportunity to read the late-filed transcript and consider the additional public comments offered during the Ft. Smith public comment hearing.

Order No. 11 at 6-8 (footnotes omitted).

On appeal, the AG asserts that the Commission's failure to consider the public comments before issuing its decision in Order No. 7 and approving the resultant rate increase was a violation of section 23-2-103(b) and rendered Order No. 7 and the subsequent compliance orders unlawful. It acknowledges the time constraints cited by the Commission in Order No. 11, which it used to explain its decision to issue Order No. 7 before receiving the transcript of the Fort Smith hearing. Nevertheless, it disagrees that the Commission's explanation justifies its decision to disregard the intent of the legislature in passing section 23-2-103(b).

In contrast, AOG argues that, in construing a statute, it is a court's duty to construe a statute just as it reads, *see Jones v. Double "D" Props.*, 352 Ark. 39, 98 S.W.3d 405 (2003), and that section 23-2-103(b) only requires the Commission to hold a hearing for purposes of public comment but does not require that it receive the transcript of the hearing before issuing a rate order. Although the wording of section 23-2-103(b) does not state specifically that the Commission must have the transcript of the public comments before it issues its decision, that was clearly the intent of the statute. Section 23-2-103 was amended in 1999 by Act 1072 to add section (b). The subtitle to the amendment reads: "TO AMEND ARKANSAS CODE 23-2-103 TO REQUIRE PUBLIC HEARINGS TO BE HELD WHEN A UTILITY REQUESTS PSC TO APPROVE A RATE INCREASE." Act of Apr. 5, 1999, No. 1072, 1999 Ark. Acts 4091 (emphasis added). The title of an act, while not part of the law, may be referred to in order to help ascertain the intent of the General Assembly. *Routh Wrecker Serv., Inc. v. Wins*, 312 Ark. 123, 847 S.W.2d 707 (1993); *see also Quinney v. Pittman*, 320 Ark. 177, 895 S.W.2d 538 (1995). Furthermore, a statute will not be given a literal interpretation if it leads to absurd consequences that are contrary to legislative intent, *see AT&T Commc'ns of the Sw., Inc. v. Ark. Public Serv. Comm'n*, 344

Ark. 188, 40 S.W.3d 273 (2001), or defeats the plain purpose of the law, *Weiss v. Cent. Flying Serv., Inc.*, 326 Ark. 685, 934 S.W.2d 211 (1996). We agree with the AG that section 23-2-103(b) requires that the comments of the public hearing be considered prior to the Commission issuing a decision to change a utility's rates. We now must determine whether the Commission's failure to have received the comments from the public hearing before it issued Order No. 7 mandates reversal of Order No. 7.

Our standard of review of appeals from the Commission is provided by the General Assembly in Ark. Code Ann. § 23-2-423(c)(3) and (4) (Repl. 2002):

> (3) The finding of the commission as to the facts, if supported by substantial evidence, shall be conclusive.

> (4) The review shall not be extended further than to determine whether the commission's findings are supported by substantial evidence and whether the commission has regularly pursued its authority including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or of the State of Arkansas.

*See Ark. Gas Consumers, Inc. v. Ark. Pub. Serv. Comm'n*, 354 Ark. 37, 118 S.W.3d 109 (2003); *AT&T Commc'ns of the Sw., Inc. v. Ark. Pub. Serv. Comm'n*, 67 Ark. App. 177, 994 S.W.2d 494 (1999); *Bryant v. Ark. Pub. Serv. Comm'n*, 54 Ark. App. 157, 924 S.W.2d 472 (1996). If an order of the Commission is supported by substantial evidence and is neither unjust, arbitrary, unreasonable, unlawful, nor discriminatory, then the appellate court must affirm the Commission's action. *Bryant v. Ark. Pub. Serv. Comm'n*, 46 Ark. App. 88, 877 S.W.2d 594 (1994). Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis, and something more than mere error is necessary to meet the test. *Bryant*, 54 Ark. App. at 168, 924 S.W.2d 479. To set aside the Commission's action as arbitrary and capricious, the appellant must prove that the action was a willful and unreasoning action, made without consideration and with a disregard of the facts or circumstances of the case. *Id.*

 Had the Commission denied rehearing of this issue, we would be compelled to reverse. The Commission, however, had the opportunity to review the public comments after the AG raised

this issue and addressed those comments in Order No. 11. Furthermore, the AG has not argued that the increase in residential rates approved by Order Nos. 7 and 8 was not supported by substantial evidence and, therefore, has failed to show that the residential ratepayers were prejudiced by its orders. In *Arkansas Public Service Commission v. Yelcot Telephone Co.*, 266 Ark. 365, 585 S.W.2d 362 (1979), the appellant argued that the trial court erred in entering its November 1, 1978 order, alleging that it was a final order entered without notice to the appellant and without providing the appellant an opportunity to respond to the petition filed by the appellee. The supreme court held that, even if the trial court was in error in entering the order in the manner in which it did, it would not reverse a judgment for an error that is unaccompanied by prejudice, commonly referred to as "harmless error." *Id.* at 375, 585 S.W.2d at 367. Error is no longer presumed prejudicial. *See Cent. Ark. Tel. Coop., Inc. v. Ark. Pub. Serv. Comm'n*, 61 Ark. App. 147, 965 S.W.2d 790 (1998).

Because the Commission did consider the Fort Smith comments on rehearing, and because the AG has not argued that the residential rates that resulted from Order No. 7 were not supported by substantial evidence, we will not reverse Order No. 7 on this issue. Nevertheless, we stress that the Commission does not have the option to follow at its pleasure the laws enacted for the benefit of the ratepayers and emphasize that we do not expect to confront this action again.

### AG Issue II — Order No. 7 Was Not Supported by Substantial Evidence

The AG's second issue on appeal is that Order No. 7 was not supported by substantial evidence because the Commission did not address whether the month of April should have been included in the "winter (peak) usage period" for purposes of determining the costs allocated to gathering and transmission mains, and because it allowed AOG to reclassify 138 miles of gathering and transmission mains to distribution without requiring it to carry over the reclassified mains into its zero-intercept study. We will address the inclusion of April in the winter (peak) usage period first.

In the proceedings leading up to Order No. 7, the parties debated over the portions of AOG's gathering and transmission plant that should be classified as demand related (the firm service the company commits itself to purchase on a daily, seasonal, or annual basis) and the percentage that should be classified as

commodity related (the actual quantities purchased by the company). Initially, most of the parties proposed differing percentages: the AG wanted 100% to be classified commodity related; CEUG and WCAGC wanted 100% to be classified demand related; and AOG and Staff recommended that costs be classified as both commodity and demand. AOG recommended 50% to commodity and 50% to demand, and Staff recommended 31.4% be classified as commodity and 68.5% as demand, explaining that approximately 68.5% of AOG's weather-normalized sales occur during the winter (peak) usage period.

In recommending that 68.5% be allocated as demand-related, Staff witness Adrienne Bradley referenced AOG witness David Heintz's direct testimony that gathering and transmission facilities serve two purposes, delivering gas both during peak periods and on an annual basis. She stated that, based upon her review of AOG's Exhibit E-12, she determined that 68.5% of AOG's weather-normalized sales occurred during the winter (peak) usage period and therefore classified 68.5% of production, gathering, and transmission costs as demand related. She said the 68% allocation was based upon AOG's weather-normalized sales during winter usage months and that the "weather normalized average" is the period from November through April. She also stated that, if April is not included in the weather-normalized average, the demand allocation percentage would be reduced from 68.5% to 61%.

The AG also cross-examined AOG witness David Heintz concerning the inclusion of the month of April in the winter (peak) usage period. The AG presented Heintz with Exhibit AG Cross 1, which consisted of AOG's response to the AG's Interrogatories Nos. 1-7, which asked AOG to provide the total gas throughput and heating-degree days for each day of the most recent twelve months available. The exhibit included the daily-degree days for a twelve-month period supplied by AOG. Heintz explained that heating-degree days are defined as the number of degrees less than sixty degrees of average temperature; that a day when the average temperature is fifty-nine would be called a one heating-degree day; that a below-twenty heating-degree day would be a mean temperature of greater than forty degrees; and that heating-degree days less than five would compute to a mean temperature of greater than fifty-five degrees. He acknowledged that the first page of Exhibit AG Cross 1 listed a summary of the daily-degree days that AOG provided for the months of Novem-

ber 2004 through March 2005 and admitted that, looking at the summary, he did not see any heating-degree days for April that were greater than twenty. In contrast, the summary also showed that the other "winter" months had heating-degree days greater than twenty: November had two days, December and January each had eighteen days, February had seven days, and March had six days. April had no heating-degree days greater than twenty, and it had only four heating-degree days greater than nine, which ranged between eleven and thirteen heating degrees. Relying on Exhibit AG Cross 1 and the testimony of Heintz and Bradley, the AG argued that the evidence proves that April is dramatically different from November through March in terms of how cold it is and that, if April was not included in the winter (peak) usage months, the 68.5% demand figure allocation would be reduced to 61%. The Commission, in Order No. 7, adopted Staff's recommendation to allocate 31.4% to commodity and 68.5% to demand, without addressing the inclusion of April in the calculation. The Commission explained:

> Having determined that AOG's gathering and transmission plant costs are both commodity and demand related, the next step is to determine the portions that are commodity and demand related. Staff witness Bradley demonstrates that AOG's gathering and transmission service relates to the 68.5 percent of normalized sales under winter (peak) conditions and is demand related. The remaining 31.4 percent of gathering and transmission plant relates to annual gas demands or commodity. Allocating 31.4 percent of gathering and transmission facilities on the basis of average demands, and 68.5 percent on the basis of peak demands properly recognizes the annual sustained deliveries over these facilities and deliveries at times of elevated demand. We accept as reasonable Staff's classification of AOG's gathering and transmission facilities.

Order No. 7 at 39-40. The AG again raised the issue of April's inclusion in its petition for rehearing, but it was denied.

On appeal, the AG argues that Order No. 7 should be reversed because the Commission disregarded, without comment, the substantial evidence it presented that April should not be considered a winter (peak) usage month. It stresses the significant disparity in heating-degree days between April and the other five months subject to the Weather Normalization Adjustment period and that no other party provided conflicting evidence. The Commission and AOG respond that the focus should not be on whether

April should be included in the winter (peak) usage calculation but whether there was substantial evidence to support the Commission's decision to allocate the gathering and transmission costs to 68.5% demand and 31.4% commodity. The Commission contends that the AG posed the wrong question and that the question for review is not whether the evidence would have supported a contrary finding but whether it supports the finding made. To establish the absence of substantial evidence, an appellant must show that the proof before the administrative tribunal was so nearly undisputed that fair-minded persons could not reach its conclusion. *Bryant v. Ark. Pub. Serv. Comm'n*, 57 Ark. App. 73, 941 S.W.2d 452 (1997).

The Commission emphasizes Bradley's testimony that her recommended classification percentages were similar to percentages that would be obtained using "the Average and Peak allocation methodology," an alternative methodology that the Commission has accepted as reasonable and used in the Commission's two most recent gas cases to separate demand and commodity related costs. It also relies on the AOG's E-12 schedule to support its finding that approximately 68% of AOG's weather-normalization sales occur during the winter (peak) usage period, the months of November through April. The Commission's argument, however, does not address the issue raised by the AG.

It may be that there was evidence before the Commission to support the 68.5% allocated to demand regardless of whether April is included as a winter (peak) usage month; however, we are not able to determine that from the information supplied. The AG, in its application for rehearing, reviewed the evidence that supported the exclusion of April as a winter month, the fact that its evidence was not controverted by any party during the hearing, and Bradley's admission that the 68.5% demand allocation would be reduced to 61% if April was excluded from the weather-normalized average. Despite this evidence, the Commission chose not to address it.

This court cannot speculate as to whether the month of April should have been included in the winter (peak) usage period that was relied on by the Commission to support the 68.5% demand allocation. This was a finding that should have been made by the Commission. Arkansas Code Annotated section 23-2-421(a) (Repl. 2002) requires that the "Arkansas Public Service Commission's decision shall be in sufficient detail to enable any court in which any action of the commission is involved to

determine the controverted question presented by the proceeding." The Commission's findings must be in sufficient detail to enable the courts to make an adequate, meaningful review; this court must know what the findings of the Commission are before they can be given conclusive weight; and, as between conflicting statements, the Commission must make findings to show which of the evidence it accepts as competent and worthy of belief and that which it rejects. See *Bryant v. Arkansas Public Service Commission*, 62 Ark. App. 154, 969 S.W.2d 203 (1998), where this court remanded a Commission order with directions to render adequate findings because it was unable to address some of the arguments raised by the appellant. In doing so, this court quoted from an earlier opinion in *Bryant v. Arkansas Public Service Commission*, 45 Ark. App. 56, 871 S.W.2d 414 (1994):

> [I]t must be possible for the reviewing court to measure the findings against the evidence from which they were educed. *Southwestern Bell. Tel. Co. v. State Corp. Comm'n*, 192 Kan. 39, 386 P.2d 515, 524 (1963). In *Town of New Shoreham v. Rhode Island Public Utilities Commission*, 464 A.2d 730 (R.I. 1983), the Rhode Island Supreme Court Stated:
>
>> This court does not sit as a factfinder; our role is "to determine whether the commission's decision and order are lawful and reasonable and whether its findings are fairly and substantially supported by legal evidence and substantially specific to enable us to ascertain if the facts upon which they are premised afford a reasonable basis for the result reached." *Rhode Island Consumers' Council v. Smith*, 111 R.I. at 277, [302 A.2d 757, 762 (1973)]. However, if the commission fails to set forth sufficiently the findings and the evidentiary basis upon which it rests its decision, we shall not speculate thereon or search the record for supporting evidence or reasons, nor shall we decide what is proper. Instead, we shall remand the case in order to provide the commission an opportunity to fulfill its obligations in a supplementary or additional decision. *Id.* at 278, 302 A.2d at 763.
>
> *Town of New Shoreham v. Rhode Island Pub. Util. Comm'n*, 464 A.2d at 732. See also *Petition of New England Tel. & Tel. Co.*, 115 Vt. 494, 66 A.2d 135 (1949), in which the Supreme Court of Vermont held that the requirement that 'the public service commission make its findings of fact imposes upon the commission the duty to sift the evidence and state the facts, and when the essential findings have

not been made, the court is unable to act as factfinder but must instead remand the case for such findings.

*Bryant*, 45 Ark. App. at 64, 871 S.W.2d at 418 (quoted in *Bryant*, 62 Ark. App. at 159-60, 969 S.W.2d at 207.

■ The Commission also attempts to persuade us that the issue of April's inclusion was not properly presented to the Commission because this issue was not listed on the Issue List filed in the docket. The opening paragraph to this exhibit, however, said that, "[i]f an issue is not listed as contested or uncontested, this does not preclude it from being contested at the hearing." Comm. Supp. Add. at 3. Moreover, the AG raised the issue of including April as a peak (usage) month in its cross-examination of Staff witness Bradley and AOG witness Heintz and in its closing argument. Accordingly, we hold that the issue was properly before the Commission and remand with direction to make adequate findings on this issue.

The AG also argues that Order No. 7 is not supported by substantial evidence because the Commission allowed AOG to reclassify 138 miles of gathering and transmission pipe to distribution but did not require AOG to carry over this reclassification into its zero-intercept study, thereby resulting in unreasonable rates. The AG does not challenge the Commission's decision to allow AOG to reclassify the 138 miles of gathering and transmission mains to distribution mains. Instead, it challenges its failure to require AOG to include the reclassified mains in its zero-intercept study on which Staff relied, and the Commission ultimately adopted, to determine how much of AOG's distribution mains should be classified as customer related. The AG argues that too much of the costs of distribution mains were classified as customer cost because the reclassified mains were not considered in the study.

AOG witness David Heintz testified that AOG prepared a cost of service study[1] to be used in determining the customer-cost

---

[1] COST OF SERVICE — A term used in public utility regulation to mean the total number of dollars required to supply any total utility service (i.e. revenue requirements); it must include all of the supplier's costs, an amount to cover operation and maintenance expenses, and other necessary costs such as taxes, including income taxes, depreciation, depletion, and amortization of the property not covered by ordinary maintenance. Included

component of its distribution mains and that, where possible, distribution-plant costs were directly allocated to the customer classes based on the data contained in the AOG's plant records. He stated that the zero-intercept study was used to classify the cost of distribution mains, which is one of the two commonly used methods to determine the customer-cost component of distribution mains. He explained that, under the zero-intercept method, a customer-cost component is developed through regression analysis to determine the unit cost associated with the zero-inch-diameter distribution main and that plant records are used to determine the type (plastic and steel), size (diameter), date, cost, and footage of distribution main installed on the system. The unit costs are then regressed against the age of the mains. He admitted that, of the reclassified mains, approximately 136 miles were steel mains and less than two miles were plastic mains, and he agreed that steel mains had a lower customer percentage than plastic mains. He stated that he would expect that the customer component would be lower if all the reclassified mains were included in the zero-intercept study.

AG witness William B. Marcus argued that the Commission should modify the zero-intercept study results obtained by AOG and reduce the customer component, particularly for plastic mains, because the reclassified transmission and gathering mains were not included in the study, either to develop the regressions or to develop appropriate percentages of customer-related costs. He

---

also is a fair return in order that the utility can maintain its financial integrity, attract new capital, and compensate the owners of the property for the risks involved.

*Bryant v. Ark. Pub. Serv. Comm'n,* 57 Ark. App. 73, 80 n.1, 941 S.W.2d 452, 456 n.1 (1997).

A "cost of service study" is made in order to assist in determining the total revenue requirements to be recovered from each of the various classes of service. The [amount] to be recovered from each of the classes of service is determined by the management or a commission after study of the various factors involved in rate design. Cost analysis or cost allocation is an important factor in rate design but only one of several important factors. Cost analysis does not produce a precise inflexible "cost of service" for any individual class of service because cost analysis involves judgment in certain cost areas. Its principal value is in determining the minimum costs attributable to each class of service. Other factors that must be considered in rate design are the value of the service, the cost of competitive services, the volume and load factor of the service and their relation to system load equalization and stabilization of revenue, promotional factors and their relation to the social and economic growth of the service area, political factors such as the sizes of minimum bills and regulatory factors. American Gas Association, *Glossary for the Gas Industry* 13 (4th ed. 1986).

*Id.* at 80 n.2, 941 S.W.2d at 456 n.2.

stated that additional data had been requested because gathering and transmission mains are larger and made of steel and have a lower customer component than distribution mains, which are generally made of plastic. He recommended a revised zero-intercept study that included the reclassified mains as 14% allocated by customer count.

CEUG witness Timothy Staley also testified that he had specific concerns associated with AOG's zero-intercept method approach to allocating distribution mains because it included a combination of steel and plastic pipe. He proposed conducting the study using plastic pipe because he reasoned that all new piping will be plastic and the existing steel distribution mains eventually will be replaced with plastic mains. He supported distribution mains being allocated 50% to customer function and 50% to demand function.

Staff witness Adrienne Bradley also discussed the effect of classification of distribution mains on customer rates. She stated that AOG initially proposed that distribution-main costs be classified as approximately 28% customer related and 72% demand related based on zero-intercept method analysis but that she proposed classifying approximately 30% of AOG's investment in distribution mains as customer related based on some errors she corrected in AOG's model. She testified that including the reclassified distributions mains in the zero-intercept analysis would require the unit cost data for the reclassified plant but that AOG has stated that this data is not currently available. She therefore recommended excluding the reclassified plant from the zero-intercept regression, although she agreed that the customer-related percentage of AOG's total system likely would be lower after adding 136 miles of steel main and less than two miles of plastic main. She reiterated, however, that the unit cost data was not available and, therefore, only an approximate directional move, and not an exact number, could be inferred from that data. After hearing the evidence, the Commission adopted Staff's classification and allocation of AOG's distribution-main costs as more reasonable.

The AG argues that it presented substantial and unrebutted evidence demonstrating that including the reclassified main in the zero-intercept study would lower the customer component and, therefore, the 30% customer allocation adopted by the Commission was not supported by substantial evidence. The Commission has wide discretion in choosing its approach to rate regulation and this court does not advise the Commission as to how to make its findings or exercise its discretion. *Consumer Utils. Rate Advocacy*

*Div. v. Ark. Pub. Serv. Comm'n*, 86 Ark. App. 254, 184 S.W.3d 36 (2004); *Bryant*, 57 Ark. App. at 78, 941 S.W.2d at 455. This court has observed that the allocation of gas mains is an area in which it is appropriate to recognize the Commission's experience, technical competence, and specialized knowledge, and the discretionary authority conferred on the Commission. *Consumer Utils. Rate Advocacy Div.*, 86 Ark. App. 254, 184 S.W.3d 36; *Bryant*, 57 Ark. App. at 78, 941 S.W.2d at 455; *Bryant v. Ark. Pub. Serv. Comm'n*, 50 Ark. App. 213, 907 S.W.2d 140 (1995). The burden was on the AG to show that the Commission's holding was not supported by substantial evidence. *Consumer Utils. Rate Advocacy Div.*, 86 Ark. App. at 275, 184 S.W.3d at 50.

> For purposes of determining whether an administrative agency's decision is supported by substantial evidence, the question on review is not whether the testimony would support a contrary finding but whether it supports the finding that was made. To do this an appellant must show that the proof before the Commission was so nearly undisputed that fair-minded persons could not reach the conclusion the Commission did. Evaluation of testimony is for the Commission, not the courts; to hold that testimony does not constitute substantial evidence, this court must find the testimony has no rational basis.

*Id.* (citations omitted); *see also Bryant*, 57 Ark. App. at 85, 941 S.W.2d at 459.

Although the AG did obtain testimony from AOG witness Heintz and Staff witness Bradley that inclusion of reclassified mains would likely lower the customer portion, the AG did not produce evidence to show how much the customer count would be reduced. Staff witness Bradley said that she could not give an exact outcome, but only a directional move, and that Heintz had merely stated that it would be lower. While we recognize that the AG obtained some testimony that the allocation of distribution mains' cost could have been lowered if the relevant data was available, that evidence is not sufficient to convince this court that the Commission's adoption of Staff's customer allocation is not supported by substantial evidence. We affirm on this issue.

### WCAGC Issue I — The Commission's Failure to Make Appropriate Findings of Fact

West Central Arkansas Gas Consumers (WCAGC) argues that the Commission's failure to make appropriate findings of fact

on all the issues arising in this proceeding violates Ark. Code Ann. § 23-2-421 (Repl. 2002), which requires that decisions of the Commission be in sufficient detail to enable any court in which any action of the Commission is involved to determine the controverted question presented by the proceeding. Specifically, WCAGC contends that the Commission's orders did not address AOG's proposals to prevent AOG's retail gas transportation customers from getting any portion of their natural gas supply requirements from anywhere other than AOG's system (supply exclusivity); to prohibit AOG's large business transportation customers from resolving natural gas nomination and delivery imbalances through in-kind gas exchanges (monthly cash-out requirement); and to revise its customer deposit policy to require any customer shifting from transportation to sales service to pay a deposit based on an estimated year's worth of bills. Despite the Commission's silence on these proposals, WCAGC argues that the revised tariffs submitted by AOG in compliance with Order No. 7 embodied AOG's proposals on the supply-exclusivity issue and the monthly cash-out requirement.[2] WCAGC argues that it raised these issues in its petitions for rehearing of Orders No. 7 and 8 but that the Commission again failed to address these issues. WCAGC concludes that Orders No. 7, 8, and 11 should be reversed because they contain no factual findings associated with AOG's supply-exclusivity, monthly cash-out requirement, and "deposit refunding/interest requirement" proposals. Although WCAGC treats these proposals as one issue, we will discuss each proposal separately.

AOG's rate application and compliance tariffs adopted by Order No. 8 contained the following provision in its Business Rate Schedule Appendix that WCAGC refers to in its brief as supply-exclusivity issue: "Customer shall receive, through Company's system, Customer's entire gas supply requirements for Customer's facility. Upon Customer's request, Transportation Customer may purchase Reserved Stand-by service pursuant to Company's Rate Schedule WA-8." WCAGC contends that its witness Adrian Moorhead and AOG witness Michael Callan each addressed this provision. It does not discuss the content of either

---

[2] WCAGC admits that the Commission eventually rejected AOG's third proposal — its attempt to force business transportation customers to pay increased deposits for switching to sales service — but, otherwise, the Commission approved the compliance tariffs in Order No. 8.

witness's testimony, although its footnote states: "WCAGC notes the supply-exclusivity issue was previously referred to in WCAGC's testimony and Petition for Rehearing as fuel exclusivity. WCAGC will use the term 'supply exclusivity issue' for convenience and to prevent confusion in the briefing process."

In his direct testimony, WCAGC witness Moorhead asserted that AOG modified its tariff to require transportation customers to purchase fuel exclusively from AOG; that transportation customers should be able to pursue a least-cost gas-purchasing strategy and purchase fuel from their desired sources where they may be able to purchase gas at a lower cost; and that the provision was anticompetitive and discriminatory. In his surrebuttal testimony, Moorhead also asserted that AOG's fuel-exclusivity provision was eliminated through negotiated settlement in AOG's last rate case and that AOG has not provided any explanation for the change.

AOG argues that the issue WCAGC raised at the hearing on "fuel exclusivity" is different from the "supply exclusivity" issue it is now raising. It contends that the term "fuel," which WCAGC used at hearing, and the term "supply," which it is now using on appeal, have two separate meanings within the gas industry. AOG explains that "fuel" denotes natural gas used by the service provider in the performing of the service, such as the natural gas used to run dehydrators and compressors on a natural gas system and LUFG (lost and unaccounted for gas). The Commission agrees and clarifies that "fuel" does not include the supply of gas sent to customers. The surrebuttal testimony of AOG witness Michael Callan supports AOG's description of WCAGC's argument before the Commission. Responding to a question asking him to address the concerns of Moorhead concerning tariff modifications, he replied:

> First, Mr. Moorhead claims that AOG's proposed tariffs require MBT [medium business transportation] and LBT [large business transportation] customers to purchase "fuel" exclusively from AOG. I assume Mr. Moorhead is referring to LUFG, since AOG does not provide compression; and, therefore, does not require fuel in its operations. Assuming that Mr. Moorhead is referring to LUFG instead of fuel, he is still wrong. Had Mr. Moorhead reviewed the provisions set out in AOG's proposed rate schedules,

> he would have noted that AOG is proposing to allow MBT and LBT transport customers to provide their LUFG contribution in-kind. . . .

Moorhead later responded that AOG's proposals to force transportation customers to receive, through the company's system, the customer's entire gas-supply requirements for customer's facility is an attempt by AOG to bar its transportation customers from taking gas from any source other than AOG's system. He argued that fuel exclusivity was eliminated through the negotiated settlement that resolved AOG's last rate case, APSC Docket 02-024-U, and that there is no explanation in AOG's original application of any need for this change. He argued that AOG had not presented any evidence that it had been harmed by the elimination of the fuel exclusivity provision.

AOG responds that the wording to which WCAGC objected in AOG's tariffs, "Customer shall receive, through Company's system, Customer's entire gas supply requirements," addresses "supply" as opposed to "fuel" requirements. It then quotes language from the Business Rate Schedule in Docket No. 02-024-U that states: "Customer agrees to transport, through Company's system, Customer's gas supply requirements for Customer's facility. . . ." AOG contends that its customers have always been required to utilize AOG's service exclusively for the customers' supply requirements and, therefore, the word "entire" is superfluous and that it has no objection to its removal. It concludes that, even though AOG customers have the option of purchasing gas supplies from a third party on AOG's system, WCAGC apparently mistakenly believed AOG was imposing a requirement that "fuel" be purchased from AOG.

After reviewing the testimony abstracted by the parties, we are unable to determine whether WCAGC was raising issues before the Commission concerning fuel in its narrow sense, gas used to run AOG's system, or supply, the gas used by customers. Its argument on appeal does not end our confusion. At one point in its brief, it argues that AOG's proposal prohibits its retail gas transportation customers from *getting* any portion of their natural gas requirements from anywhere other than AOG's system, but later in its brief, it states that Orders No. 7, 8, and 11 are silent on AOG's proposal to require gas transportation customers to *transport* their entire natural gas supply requirements through AOG's system. WCAGC seems to be making two inconsistent arguments.

We are unable to determine whether WCAGC is complaining about the acquisition of gas or the transporting of gas.

█ The burden is on WCAGC to adequately explain and argue what it is appealing and point to evidence before the Commission to support its argument. WCAGC admits in its reply brief that its witness Mr. Moorhead may have referred to the exclusivity provision improperly. Not only is its argument unclear on appeal, it also contains no discussion of the evidence or citation to authority[3] and fails to explain how AOG's tariff is anticompetitive and discriminatory. To the extent that WCAGC feels the Commission did not adequately address this issue, we do not find this omission, if any, is reversible error. When an appellant neither cites authority nor makes a convincing argument, and where it is not apparent without further research that the point is well taken, the appellate court will affirm. *Quinney*, 320 Ark. at 188, 895 Ark. at 544; *see also AT&T Commc'ns*, 67 Ark. App. at 186, 994 S.W.2d at 500.

### AOG's Proposal that Transportation Customers Cash Out All Imbalances on a Monthly Basis

WCAGC also contends that the Commission's orders allowed AOG to make tariff changes without appropriate findings of fact by not addressing AOG's proposal that would require transportation customers to cash out all imbalances on a monthly basis instead of resolving its natural gas delivery imbalances through in-kind gas exchanges. The record in this proceeding consists of 5467 pages; however, WCAGC's entire argument on this issue is limited to the following statement: "AOG witness Callan addressed AOG's proposal to require transportation customers to cash out imbalances monthly. Mr. Daniel Frey, witness for Seminole Energy Services, also addressed AOG's proposal to require transportation customers to cash out imbalances monthly." This testimony, which WCAGC references but does not discuss, consists of the pre-filed testimony of Michael Callan, who stated that AOG's Business Rate Schedule Appendix contained a number of

---

[3] WCAGC's citation to *Southwestern Glass Co. v. Arkansas Oklahoma Gas Corp.*, 325 Ark. 378, 925 S.W.2d 164 (1996), offers no authority for its supply-exclusivity argument. In that case, the supreme court reversed the enjoining of the construction of Southwestern's pipeline, holding that AOG had failed to show that Southwestern's proposed pipeline interfered with the city's public use of the dedicated easement and right-of-way.

changes for the safe and economical operation of AOG's system and that one of these changes was to require large and medium business transportation customers to cash out all imbalances that remain at the end of the service month. Daniel Frey, responding to AOG's proposal, argued that AOG had not claimed to have experienced any operating problems related to the current cash-out tolerances. WCAGC concludes that Order No. 7 should be reversed because it contains no factual findings associated with this proposal.

WCAGC has not pointed this court to any testimony to show that it raised this issue before the Commission, nor do we find it mentioned in WCAGC's closing statement. The first time it appears that WCAGC raised this issue was in its Petition for Rehearing of Order No. 7, which was too late to preserve this issue for appeal. In *AT&T Communications*, 67 Ark. App. at 187, 994 S.W.2d at 500, we held that we would not address an issue where the appellants' scant references were insufficient to bring the argument before the Commission and this court. Arguments raised for the first time on appeal are not considered. *Bryant v. Ark. Pub. Serv. Comm'n*, 46 Ark. App. at 101, 877 S.W.2d at 601. Furthermore, even if we found that the issue had been raised, we would still affirm because WCAGC has barely touched upon this issue in its brief. Where appellant does not cite authority, or make a convincing argument, and where it is not apparent without further research that the point is well taken, the appellate court will affirm. *Firstbank of Ark. v. Keeling*, 312 Ark. 441, 850 S.W.2d 310 (1993); *Beverly Enters. Ark., Inc. v. Ark. Health Servs. Comm'n*, 308 Ark. 221, 824 S.W.2d 363 (1992).

*AOG's Proposal to Revise Its Customer Deposit Policy*

WCAGC's final point under this issue is that the Commission's orders were silent regarding AOG's proposal to revise its customer deposit policy. WCAGC concedes that the Commission rejected AOG's attempt to force its business trans-portation customers to pay increased deposits merely for switching to sales service but argues that it did not address Moorhead's testimony that AOG should be required to refund and pay interest on its large business customers' deposits. We disagree. In Order No. 7, the Commission did discuss Moorhead's argument, con-

cluding: "Regarding Mr. Moorhead's claim that interest on and return of deposits should be addressed, Mr. Callan asserts that the Commission already has rules in place to address these issues." Order No. 7 at 63. We note that the Commission's General Service Rule 4.06-Refunding Deposits provides that "utilities are not required to refund deposits on business or commercial accounts until the account is closed." WCAGC did not ask for an exemption from this rule. This issue is without merit, and we affirm.

*WCAGC Issue II — Commission's Approval of AOG's Compliance Tariffs Violated WCAGC's Right to Due Process*

WCAGC's second issue concerns its allegation that the Commission approved AOG's compliance tariffs in Order No. 8 only twenty-three working hours after AOG filed its revised tariffs. WCAGC contends that the brevity of time in which the Commission approved the tariffs violated its due process rights. The time sequence WCAGC complains about is that the Commission issued Order No. 7 approving a rate increase on December 1, 2005. AOG filed its revised tariffs in compliance with the new rates on December 12, 2005; on December 14, 2005, Staff witness Poole filed her compliance testimony and exhibits in support of the tariffs; and Order No. 8 that approved the compliance tariffs was issued on December 15, 2005.

The following day, WCAGC petitioned for rehearing of Order No. 8, making the same arguments that it now makes on appeal plus one additional argument. It argued that Staff had made corrections to AOG's compliance tariffs but that the Commission issued Order No. 8 approving AOG's compliance tariffs without AOG having made Staff's corrections. In Order No. 11, the Commission found WCAGC's petition without merit, explaining:

> On 9 December 2005, in accordance with the Commission's 1 December 2005 final rate case Order No. 7, the Staff filed a recalculated revenue requirement for AOG and the resulting customer class cost of service. On 14 December 2005 the Staff filed a revised customer class cost of service in order to correct an error in its 9 December 2005 filing. Thereafter, on 14 December 2005, the Staff filed the Compliance Testimony of Staff Rate Analyst Peggy Poole recommending approval of the compliance tariffs filed by AOG on 12 December 2005.

The only error or omission of Order No. 8 alleged by WCAGC is "[s]ince the tariffs that were filed on December 12, 2005 were based on Staff's erroneous revenue requirement and cost of service summary filing made on December 9 by evidence [of] ... Staff's own filing on December 14, 2005 filing, these tariffs must be suspended."

This allegation is without merit as the tariffs filed by AOG on 12 December were based on the correct non-gas revenue requirement and the corrected cost of service study as approved by Order No. 7. Staff's corrected cost of service study filing made on 14 December did not change the non-gas revenue requirement or the revenues allocated to the classes. Staff conducted a full and complete review of the tariffs filed by AOG on 12 December and subsequently filed the Compliance Testimony of Staff witness Poole on 14 December in which she recommended that the Commission approve the tariffs. Ms. Poole testified that, "[b]ased on my review, I have determined that the rates and tariffs are consistent with the provisions of Order No. 7 . . .. [and should] become effective for all gas consumption on and after December 1, 2005."

WCAGC also alleges in its request for hearing of Order No. 8 that it did not have enough time to analyze the tariffs filed by AOG on 12 December before Order No. 8 was issued on 14 December [sic] approving the tariffs. More specifically, WCAGC contends that "[no party can throughly analyze approximately 200 pages in less than sixteen working hours, and have a complete working knowledge ... if the tariffs are in compliance with the order."

Beyond the above generalized statement WCAGC fails to specifically state how its members were prejudiced by the amount of time allowed for review of AOG's compliance tariffs or to demonstrate that any substantive rights of its members were adversely affected. Additionally, though it could have done so, WCAGC did not request additional time to review these tariffs. Nor did WCAGC proffer any additional substantive pleading or testimony asserting that the tariffs were in error and not in compliance with the Commission's final rate case Order No. 7. To the contrary, the Compliance Testimony of Staff witness Poole specifically reflects that the tariffs are in compliance with Order No. 7.

Order No. 11 at 3-5.

WCAGC argues that to issue Order No. 8, a one-page order that approved AOG's compliance tariffs, in less than three full days when the Commission's Rules of Practice and Procedure give the Commission thirty days to evaluate the tariff filings means that the order was not the result of a reasoned, decision-making process but was instead a rubber stamp of Staff's hasty approval of the tariffs and was calculated to make it impossible to review the tariffs. WCAGC argues that a "fair tribunal" is a basic due process right that applies to proceedings before the Commission. *See Ark. Elec. Energy Consumers v. Ark. Pub. Serv. Comm'n*, 35 Ark. App. 47, 813 S.W.2d 263 (1991). In proceedings before the Public Service Commission, due process must be preserved to all whose legal rights are involved and concluded by the Commission's final order, and a fundamental requirement of due process in matters of public utility regulation is a full and fair hearing. *Id.* WCAGC, in attacking the Commission's procedure as a denial of due process, has the burden or proving its invalidity. *Id.*

WCAGC protests the Commission's haste in reviewing the compliance tariffs; however, it does not allege that it did not have the opportunity to have a full and fair hearing on them or to submit evidence to dispute them. The Commission points out that WCAGC did not ask for additional time to review the compliance tariffs or ask for a stay of the Commission proceeding. It also contends that reviewing compliance tariffs is not as taxing as WCAGC suggests and explains that proposed tariffs are filed with the company's general rate application and that the compliance tariffs are filed after the rate request is decided to ensure the tariffs comply with the order. Although WCAGC argues that the timing of the procedure made it impossible for the parties to analyze the order and be afforded any reasonable opportunity to file rehearing petitions, it has not argued that it was deprived of the opportunity to petition for rehearing of Order No. 8. Indeed, WCAGC did file a petition for rehearing of Order No. 8 the day following its entry, even though Ark. Code Ann. § 23-2-422(a) (Repl. 2002) gives it thirty days to formulate its petition. Nor has WCAGC argued that it has since found error in the tariffs. The error WCAGC asserted in its rehearing petition, that the tariffs approved by Order No. 8 did not take into consideration Staff's corrections, has not been pursued on appeal.

In sum, WCAGC has not identified any property right before the Commission or this court of which it has been deprived. WCAGC has not shown any prejudice. Where error is alleged,

prejudice must be shown. *See Cent. Ark. Tel. Coop., Inc.*, 61 Ark. App. at 154, 965 S.W.2d at 794. In fact, WCAGC's whole argument on this point seems to be an attack on Order No. 7 and its findings. Those specific findings, which WCAGC challenges, are dealt with elsewhere in the opinion. As to the issue under discussion, that WCAGC was denied due process because of the Commission's hurried approval of the compliance tariffs, WCAGC has failed to show that it was harmed by the approval of the compliance tariffs, and we affirm on this point. The simple fact that the WCAGC did not achieve the result it sought is not tantamount to a denial of due process. *See Ark. Elec. Entergy Consumers*, 35 Ark. App at 66, 813 S.W.2d at 274.

*WCAGC Issue III — The Commission Orders Prohibited a Fair Hearing on FERC Order No. 63 Service*

WCAGC contends that Order No. 7 and Order No. 11 erroneously allow AOG to force its retail customers to subsidize transportation service for its natural gas producers and violate WCAGC's due process rights. It contends that, in *In re Arkansas Oklahoma Gas Corporation's Purchased Gas Cost Practices*, Commission Docket No. 02-179-U, it argued that AOG's FERC Order No. 63 transportation rate discounting practices artificially reduced costs for AOG's Order No. 63 shippers and forced AOG's retail customers to subsidize their service. It states that AOG and Staff objected to the Commission's consideration of this issue in that docket and that the Commission, in Order No. 3, ruled that the issue was not appropriate for consideration in Docket No. 02-179-U and must be raised in a general rate case. WCAGC claims it did not appeal this ruling because it understood that it could raise the issue again in AOG's next rate case, relying on language from Order No. 9 of Docket No. 02-179-U, which says:

> [T]he treatment of revenues derived from AOG's discounted transportation policy within the context of an AOG rate case is jurisdictional to this Commission. Further, it is within this Commission's jurisdiction to determine whether AOG's discounted transportation policy fits prudently within the Commission's *Gas Procurement Plan Rules* and AOG's specific Gas Procurement Plan.

Order No. 9 at 38.

In AOG's present case, WCAGC argues that it again sought review of whether AOG's discounted Order No. 63 rates improperly force AOG's retail customers to subsidize transportation

service for natural gas production but the Commission refused to consider the argument, holding in Order No. 7 that WCAGC's concerns surrounding the discounting of FERC Order No. 63 rates were adequately addressed and decided in Docket No. 02–179–U. WCAGC contends that this ruling completely ignores the fact that it prohibited WCAGC from addressing the issue in Docket No. 02–179–U. It argues that the Commission cannot be allowed to reserve an issue in one case and then conclude in the later case that the issue had already been decided; that such action is arbitrary and capricious; and that it deprived WCAGC of a fair hearing and violated its due process rights.

The Commission, in responding to WCAGC's assertion, explains that FERC Order No. 63 allows AOG to transport surplus gas through its pipeline system to an interstate pipeline at a set rate and allows AOG to discount the transportation charges on this service. It states that, in a previous proceeding, the Commission found that this discounting was in the public interest and benefitted all of AOG's customers and further notes that it lacks jurisdiction to regulate FERC Order 63 service. AOG adds that, while the Commission did determine in Order No. 3 of Docket No. 02–179–U that the rate and revenue impacts of AOG's Order No. 63 transportation service could not be addressed in that docket, the Commission's reasoning in Order No. 3 was different from what WCAGC is arguing.

The Commission begins Order No. 3 by explaining that Docket No. 02–179–U was an outgrowth of Docket 02–024–U that was established to consider AOG's February 12, 2002 application for a rate increase. Order No. 14 of Docket No. 02–024–U severed the purchased-gas cost issues from that docket and transferred all purchased-gas cost issues, with the exception of AOG's Cost of Gas recovery mechanism and LUFG issues, to Docket No. 02–179–U. The other parties to Docket No. 02–024–U, which included WCAGC, did not oppose the severance motion. Thereafter, all the parties, except the AG, filed a Stipulation and Settlement Agreement in Docket No. 02–024–U that was approved by the Commission in Order No. 20 of that docket.[4] A Joint Stipulation and Settlement Agreement (Settlement) was also filed in Docket 02–179–U. WCAGC objected in part to this Settlement because it did not address AOG's policy of discounting

---

[4] Order No. 20 was subsequently appealed to this court in *Consumers Utility Rate Advocacy v. Arkansas Public Service Commission*, 86 Ark. App. 254, 184 S.W.3d 36 (2004), and

FERC Order No. 63 transportation service. AOG had then urged the Commission to exclude all non-gas issues from further consideration in Docket No. 02-179-U because AOG's Cost of Gas recovery mechanism was addressed in Docket No. 02-024-U. The Commission responded to this argument in Order No. 3:

> AOG correctly points out that WCAGC filed testimony in Docket 02-024-U specifically addressing AOG's discounted transportation rate and associated recall rights on gas. Part of WCAGC's testimony was filed in Docket No. 02-024-U *after* the commission established Docket No. 02-179-U for purpose of addressing AOG's purchased gas cost practices. AOG, therefore, asserts that these issues were addressed as part of AOG's rate case (Docket No. 02-024-U) and were covered by the Joint Stipulation and Settlement Agreement adopted by the Commission on December 11, 2004 in that docket.
>
> AOG's argument is further bolstered by WCAGC's own comments made in opening remarks at the hearing before the Commission in Docket No. 02-024-U. In particular AOG points out the following excerpt from WCAGC's Counsel's opening statement: [Excerpt omitted] Then, on page 15 of the transcript, Counsel for WCAGC acknowledged that these issues remain in the settlement, and that WCAGC is unhappy about these issues being in the settlement agreement because it may be another five years before it gets another chance to address these issues.
>
> . . . .
>
> As evidenced by the Direct and Surrebuttal Testimony of WCAGC witness Moorhead, as well as the opening statements of Counsel for WCAGC, presented in Docket No. 02-024-U, WCAGC fully litigated AOG's discounted transportation policy and associated gas recall rights issues within the contest of AOG's non-gas rate case (Docket No. 02-024-U). Now, almost a full year after the issuance of Order No. 20 in Docket No. 02-024-U, which resolved *all* issues in that proceeding, WCAGC seeks a "second bite at the apple" regarding these issues in Docket No. 02-179-U. Order No. 20 is dispositive of these issues — at least as to the impact that

---

this court affirmed the approval of the Stipulation in an opinion handed down on May 26, 2004. The appeal in our court was pending when the Commission issued Order No. 3 in Docket 02-179-U.

these issues may have had on the revenues and rates established for AOG in Docket No. 02-024-U. Accordingly, the revenue and rate implication of these issues can not and shall not be relitigated in the context of Docket No. 02-179-U.

Notwithstanding the *res judicata* effect of Order No. 20 as to the revenue and rates established for AOG in Docket 02-024-U, the Commission will allow WCAGC the opportunity in Docket No. 02-179-U to revisit, as a matter of prospective gas purchasing policy only, AOG's discounted transportation policy and associated gas recall rights. *Thus the only issue to be considered in Docket No. 02-179-U regarding AOG's discounted transportation policy and associated gas recall rights is whether such policy is in the public interest and should continue as a part of AOG's overall gas purchasing practices.*

Therefore, for purposes of considering the Staff's and AOG's August 29, 2003, Settlement Agreement, including the issue of AOG's discounted transportation policy and gas recall rights *as expressly limited hereinabove,* the following procedural schedule is hereby established: [schedule omitted].

Order No. 3, at 4-7 (footnotes omitted) (emphasis added).

As it stated in Order No. 3, the Commission revisited AOG's discounted transportation policy in Order No. 9 of Docket 02-179-U. It held that AOG's purchase transport program is a useful and necessary component of AOG's gas-procurement process that enhances AOG's ability to meet its statutory and regulatory requirements to provide reliable gas service while minimizing volatility and overall purchased-gas costs to ratepayers and should continue prospectively. WCAGC has not pointed us to any language in this order reserving the issue for its next rate case.

 We therefore find no merit to WCAGC's assertion that the Commission reserved WCAGC's concerns for a future docket and further recognize that the Commission, in fact, revisited these concerns in the present case.

Staff witness Booth notes that in Docket No. 02-179-U, this Commission concluded the AOG's discounting of its FERC Order No. 63 rate is an essential element of AOG's Purchase or Transport Program ("PTP") gas procurement process. Mr. Booth states that in Order No. 9 of Docket No. 02-179-U, the Commission found the PTP to be a "useful and necessary component of AOG's gas

procurement process and should continue prospectively." He states that the Commission also determined that all of AOG's customers, both sales and transportation, have realized benefits from AOG's discounting of its FERC Order No. 63 service. Mr. Booth states that Mr. Moorhead's concerns surrounding the discounting of FERC Order No. 63 rates have been previously addressed and decided by this Commission, and that Witness Moorhead's testimony presents no additional information or arguments not already considered by the Commission. (T. 712) Mr. Booth also states that the FERC found that AOG's offering of a uniform discount rate for Order No. 63 service not to be unduly discriminatory. (T. 713)

The Commission finds that WCAGC's concerns surrounding the discounting of FERC Order No. 63 rates have been adequately addressed and decided in Docket No. 02-179-U. The Commission agrees with Staff that WCAGC presents no additional information or arguments not already considered.

Order No 7 at 53-54. WCAGC has been given a hearing in three different dockets and has no basis for claiming it was denied due process.

### WCAGC Issue IV — AOG's Proposal to Lower the Imbalance Percentages

WCAGC for its final issue contends that the Commission shifted the burden of proof to the consumer concerning AOG's proposal to lower the imbalance percentages. It argues that AOG witness Callan proposed to reduce the balancing penalty threshold percentage applicable to retail transportation service from 10% to 5% based on the potential that transportation customers might "game the system" when gas prices are high. It states that WCAGC witness Moorhead and CEUG witness Timothy Staley opposed the proposal, testifying that, although AOG has proposed to change its monthly imbalance tolerance from 10% to 5% for its transportation customers in order to protect the AOG's sales customers from abuse by its transportation customers, it has not demonstrated that such abuse has historically occurred. Therefore, there is no substantial evidence in the record to support the change.

AOG witness Callan responded to this testimony:

Mr. Staley takes inconsistent positions with respect to this issue. He notes that the reduction in the balancing tolerance is designed to

protect the Company's sales customers from abuse by Transportation (MBT and LBT) customers on the AOG system, but then he states AOG has not demonstrated that such abuse has historically occurred. Mr. Staley fails to point out that during times of extremely high natural gas prices, especially times of volatile natural gas prices, abuse by Transportation customers can have a significant financial impact on AOG's Sales customers. Specifically, Transportation customers, which are buying their natural gas from parties other than AOG, have the very real potential to "game" the AOG system during times of wide discrepancy in what the Transportation customer pays for natural gas and what AOG pays for natural gas. Reducing the imbalance tolerance from 10% to 5% insures that Sales customers do not subsidize the natural gas purchases of the transport customers.

The Commission discussed in detail CEUG's witness Staley's testimony and the rebuttal testimony of AOG witness Callan in Order No. 7. It also noted that Staff witness Robert Booth agreed with AOG's proposal and pointed out that none of the parties had offered any evidence that AOG's proposal was unreasonable. The Commission concluded that it accepted as reasonable AOG's proposal to reduce the monthly imbalance tolerance from 10% to 5% and went on to explain its reason for doing so:

> The Commission accepts as reasonable AOG's proposal to reduce the monthly imbalance tolerance from 10% to 5%. Balancing is defined as the act of making deliveries and the receipts of gas into or withdrawals from an interstate pipeline or local distribution company system equal. The balancing tolerance is the amount of imbalance allowed by a pipeline or utility which is not subject to a penalty charge usually stated in a range expressed in percentage terms. AOG witness Callan testified that transportation customers buying their gas from third parties have the potential to "game" the AOG system during times when there is a wide difference between the market price and the price AOG pays for natural gas. (T. 89) With the approach of the winter heating season and with the expectation of higher natural gas prices, there is a real need for AOG to have in place incentives to prevent transportation customers from taking more gas off the system than they deliver. A lower monthly imbalance tolerance will help to impede the disruption of service to the sales customers that AOG is obligated to serve.

Order No. 7 at 60.

The Commission has wide discretion in choosing its approach to rate regulation, and the appellate court may not advise the Commission as to how to make its findings or exercise its discretion. *Consumer Utilities*, 86 Ark. App. at 263, 184 S.W.3d at 42. Here, the Commission found that AOG met its burden of producing sufficient evidence of real potential harm for abuse of AOG's system and WCAGC had not demonstrated that the potential for abuse did not exist. Furthermore, no party offered evidence that the proposal was unreasonable. We therefore affirm on this point.

In conclusion, we remand this case to the Commission to make adequate findings on the issue raised by the AG concerning whether the month of April should have been included in the winter (peak) usage period for the purpose of determining the costs allocated to gathering and transportation mains. All other issues raised by the appellants are affirmed.

Affirmed in part; remanded in part.

PITTMAN, C.J., and HART, GLADWIN, ROBBINS, and BIRD, JJ., agree.