ENTERGY ARKANSAS, INC. *v.*
ARKANSAS PUBLIC SERVICE COMMISSION

CA 07-949 289 S.W.3d 513

Court of Appeals of Arkansas
Opinion delivered December 17, 2008

148

152

*Tucker Raney*, Assistant General Counsel, Entergy Servs. Inc.; *Perkins & Trotter*, by: *Scott C. Trotter*; *Williams & Anderson, PLC*, by: *Philip E. Kaplan* and *JoAnn C. Maxey*; and *Wright, Lindsey & Jennings, LLP*, by: *N.M. Norton*, for appellant.

*Valerie F. Boyce*, Staff General Counsel, and *Lori L. Burrows*, Staff Attorney, Arkansas Public Service Comm'n; and *Dustin McDaniel*, Att'y Gen., by: *Sarah R. Tacker*, Ass't Att'y Gen., for appellees.

Robert J. Gladwin, Judge. The Arkansas Public Service Commission (PSC) ordered a $5.67 million rate decrease for Entergy Arkansas, Inc., an electric utility that serves approximately 670,000 customers in the state. Entergy appeals on numerous grounds, one of which merits a partial reversal. In all other respects, we affirm the PSC's decision.

On August 15, 2006, Entergy petitioned the PSC for an increase in retail rates. The petition, as amended, sought approximately $106.5 million in additional revenue. A number of entities intervened in the case, including the Attorney General's Utilities Rate Advocacy Division. After the parties submitted voluminous

pre-filed testimony, a hearing was conducted from April 25, 2007, through May 4, 2007. Thereafter, the PSC issued Order No. 10, finding that Entergy's revenue requirement was excessive and should be reduced by approximately $5.67 million, effective June 15, 2007.[1] Entergy petitioned for rehearing, which the PSC's Order No. 16 denied in all pertinent respects. This appeal followed. Entergy asserts sixteen arguments (along with several sub-arguments) for reversal.

### I. Standard of Review

The PSC has wide discretion in choosing its approach to rate regulation and we do not advise the Commission on how to make its findings or exercise its discretion. *Consumer Utils. Rate Advocacy Div. v. Ark. Pub. Serv. Comm'n*, 99 Ark. App. 228, 258 S.W.3d 758 (2007). Our review of PSC orders is limited by Ark. Code Ann. § 23-2-423(c) (Repl. 2002), which provides in part:

> (3) The finding of the commission as to the facts, if supported by substantial evidence, shall be conclusive.

> (4) The review shall not be extended further than to determine whether the commission's findings are supported by substantial evidence and whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violated any right of the petitioner under the laws or Constitution of the United States or of the State of Arkansas.

If an order of the Commission is supported by substantial evidence and is neither unjust, arbitrary, unreasonable, unlawful, nor discriminatory, the appellate court must affirm the Commission's action. *See Consumer Utils. Rate Advocacy Div., supra; Bryant v. Ark. Pub. Serv. Comm'n*, 46 Ark. App. 88, 877 S.W.2d 594 (1994). To establish an absence of substantial evidence, the appellant must demonstrate that the proof before the Commission was so nearly undisputed that fair-minded persons could not reach its conclusion. *Id.* Administrative action may be regarded as arbitrary and capricious where it is not supportable on any rational basis, and something more than mere error is necessary to meet the test. *See Consumer Utils. Rate Advocacy Div., supra.* To set aside the Com-

---

[1] This amount was subsequently recalculated by the PSC Staff to approximately $5.13 million.

mission's action as arbitrary and capricious, the appellant must prove that the action was a willful and unreasoning action, made without consideration and with a disregard of the facts or circumstances of the case. *Id.*

## II. Procedural Arguments

Entergy challenges three of the Commission's procedural rulings. It argues first that the PSC violated constitutional guarantees of due process by limiting the cross-examination of witnesses. A full and fair hearing is a fundamental requirement of due process in a utility rate case. *See Ark. Pub. Serv. Comm'n v. Continental Tel. Co.*, 262 Ark. 821, 561 S.W.2d 645 (1978). In almost every setting, due process includes the right to confront and cross-examine witnesses. *See Ark. Dep't of Human Servs. v. A.B.*, 374 Ark. 193, 286 S.W.3d 712 (2008).

Entergy does not argue in this case that it was wholly deprived of the opportunity to cross-examine witnesses. Rather, it contends that it was prohibited from *further* cross-examination once the Commissioners had questioned the witnesses. We find that Entergy waived this argument by not making a timely objection below.

Prior to the hearing, the Commission informed all parties of its long-standing rule that, once cross-examination of a witness by counsel was completed and the Commissioners began the independent questioning, further examination by counsel was foreclosed. Entergy did not object to this rule prior to the hearing, nor did it object on the first day of the hearing when the Chairman asked if there were any procedural matters to be addressed. Thereafter, the Commission applied the rule over two days of testimony with no objection by any party and no requests for additional cross-examination. It was not until the third day of the hearing that Entergy asked to cross-examine a witness after the Commissioners had questioned him, and, upon being denied permission to do so, objected to the rule for the first time. It is well established that a party waives an argument by not objecting below at the first opportunity. *See Swink v. Lasiter Constr., Inc.*, 94 Ark. App. 262, 229 S.W.3d 553 (2006).

In any event, we cannot say that the Commission abused its discretion in enforcing the rule, which is clearly designed to bring an end to witness examination in these lengthy cases. The Commission has wide latitude in conducting and expediting its hearings. *See Continental Tel. Co., supra.* To that end,

it may prescribe rules of procedure and use its discretion to facilitate its efforts to ascertain the facts. *See* Ark. Code Ann. § 23-2-403 (Repl. 2002). Further, as the Commission observed, it would be unfair if Entergy were allowed to pursue additional cross-examination when all other parties had refrained from doing so in reliance on the rule. Given the circumstances, we decline to reverse on this point.

■ Next, Entergy argues that the Commission violated due process by restricting the subject matter of post-hearing briefs to two contested issues, and the length of post-hearing briefs to thirty pages for the initial brief and fifteen pages for the response. Entergy has not demonstrated that the Commission's action denied it a full and fair hearing. *See Ark. Elec. Energy Consumers v. Ark. Pub. Serv. Comm'n*, 35 Ark. App. 47, 813 S.W.2d 263 (1991) (holding that the appellant, in attacking a procedure as a denial of due process, has the burden of proving its invalidity). The briefs were filed at the conclusion of an eight-day proceeding, during which the issues were well defined and the parties' positions were made exceedingly clear. There is no indication that the Commission, having viewed the extensive pre-filed testimony and heard the live testimony and cross-examination of the witnesses, was not fully aware of Entergy's arguments for a rate increase. Moreover, the Commission gave due consideration to Entergy's desire to file a more extensive brief but chose to limit any post-hearing presentations, based on constraints of time and administrative necessity. In all, the Commission was in the best position to judge what additional arguments and information, if any, it needed to render a decision. *See* Pub. Serv. Comm'n Prac. & P. R. 3.14 (requiring the Chairman to set a briefing schedule "upon finding that the filing of briefs . . . is appropriate").

■ As a final procedural argument, Entergy contends that the Commission erred in failing to consider additional, post-hearing testimony, which Entergy submitted along with its petition for rehearing. The Commission's Practice and Procedure Rule 3.11 provides that, upon agreement of the parties, the Chairman may authorize the filing of specific documentary evidence within a fixed time after the hearing. Rule 3.16(b) provides that, if a party applies for rehearing based in whole or in part on "additional evidence which was not part of the original record," the party shall attach the evidence or state the subject of any testimony. Neither of these rules required the Commission to

accept additional, post-hearing evidence in this case. There has been no showing that the parties agreed to the filing of post-hearing evidence, as required by Rule 3.11. Further, the Commission determined that the material submitted by Entergy was not "additional evidence which was not part of the original record" but was "essentially little more than a rehash of the pre-filed evidentiary testimonies . . . ." The Commission also made the following finding:

> Further, the Commission could easily conclude that the [additional evidence is] more akin to a supplemental post-hearing brief in contravention of [the Commission's order]. Further, if the Commission now were to rely on said testimonies in whole or in part without allowing the other parties the opportunity to file responsive testimony, those parties could certainly assert a violation of their due process rights.

Upon reviewing the subject testimony, we cannot say that the Commission erred in reaching the above conclusions. The additional testimony differs in no material respect from the witnesses' hearing testimony and consists chiefly of the witnesses' disagreement with the Commission's ruling and their belief in its potential adverse effects. This lends credence to the Commission's finding that the "additional evidence" is in reality an overly-lengthy brief in support of the petition for rehearing. We therefore affirm the Commission's ruling.

### III. Costs Disallowed

One of the primary objectives in a rate case is to set rates so the utility will be able to meet its legitimate operating expenses. *See Walnut Hill Tel. Co. v. Ark. Pub. Serv. Comm'n*, 17 Ark. App. 259, 709 S.W.2d 96 (1986). *See also* Robert Hahne & Gregory Aliff, *Accounting for Public Utilities*, § 7.01 (2007) (stating that it is generally assumed that a utility has a right to charge rates that will provide a reasonable opportunity to recover its costs prudently incurred in providing utility service). In this proceeding, the PSC disallowed certain costs that Entergy proposed to include in its revenue requirement. Entergy now argues that the Commission's disallowances were either arbitrary or not supported by substantial evidence.

### A. Storm Restoration Costs

Entergy first challenges the Commission's disallowance of approximately $47 million in storm restoration costs. To put this

issue in historical context, Entergy was allotted $4.8 million per year as storm restoration expenses in its last rate case in 1996. Under normalized accounting procedures, Entergy would have placed the money in a designated account and expended it as storm costs arose. Any spending above the allotted amount would have been reflected as an income loss. However, between 2002 (or earlier according to some witnesses) and 2006, Entergy employed a reserve accounting method for storm costs. When the costs outstripped the annual expense allotment, the reserve account accrued a negative balance that reached approximately $47 million by 2006. In the current rate case, Entergy asked the Commission to include the $47 million in its revenue requirement and allow future recovery of it through amortization over a five-year period. The Commission declined, ruling that such a recovery would constitute single-issue ratemaking and retroactive ratemaking. Entergy argues on appeal that the Commission's decision was arbitrary. We disagree.

Ratemaking is a forward looking process in which the utility submits evidence of its costs, using test-year data with pro-forma year adjustments. *See* Ark. Code Ann. § 23-4-406 (Repl. 2002). The Commission views the evidence and other historical information to establish future rates that are just and reasonable. *See generally* Ark. Code Ann. §§ 23-2-301 and 23-4-102 to -104 (Repl. 2002). Retroactive ratemaking is generally beyond the power of a regulatory commission, and a utility ordinarily cannot, in a future rate case, recover for past deficiencies in meeting expenses. *See* Ellsworth Nichols & Francis Welch, *Ruling Principles of Utility Regulation* 315-19 (Supp. 1964).

Entergy did not ask in this case that the Commission view the $47 million in past storm expenses only as historical data for the purpose of establishing future rates. Rather, it asked the Commission to allow it to recoup cost overruns from previous years. In doing so, Entergy fell squarely within the general disfavor of retroactive ratemaking. We therefore cannot say that the Commission acted arbitrarily in declaring that recovery of the amount would constitute improper, retroactive ratemaking.[2]

Entergy nevertheless contends that the $47 million in storm costs was a proper component of its revenue requirement because the costs were legitimately incurred. Indeed, Entergy

---

[2] Our affirmance of the Commission's finding regarding retroactive ratemaking makes it unnecessary to address its additional finding that the recovery would constitute single-issue ratemaking.

witnesses testified to the utility's excellent record of speedy restoration following storm outages, and there is no evidence that the storm costs were imprudent or excessive. But, be that as it may, a ratemaking proceeding is generally not the place to satisfy past, unmet expenses, however prudently incurred. Normalized accounting procedures do not envision a utility's accruing costs with hopes of recovering them in a future rate case.

■ Entergy argues further that the Commission previously approved the reserve accounting method for storm costs. The evidence on this point is in conflict. Entergy witnesses testified that the reserve accounting method was sound and that Entergy had employed it for storm costs since at least 1996 without the Commission's objection. However, a PSC Staff witness testified that Entergy should have been treating storm restoration costs as a normalized expense rather than allowing a negative balance to accumulate in hopes of recovering it in a subsequent rate case. The Staff witness also denied that the Commission had approved Entergy's use of reserve accounting. Given this conflict in the evidence, it was the Commission's prerogative to accept the explanation of a Staff witness over the utility's witness. *See Associated Nat. Gas Co. v. Ark. Pub. Serv. Comm'n*, 25 Ark. App. 115, 752 S.W.2d 766 (1988). Entergy also references Commission orders from previous dockets, arguing that the orders imply approval of or acquiescence in the reserve accounting method. However, none of the orders expressly approve the use of reserve accounting for storm costs. In fact, one of the orders indicates to the contrary, stating that Entergy's 1996 storm–damage expenses were normalized to reflect a reasonable, allowable annual level based on historical weather data; that the 1996 rate proceeding contemplated only a normal level of storm–damage expense; and that Entergy "bore the risk of incurring some storm damage expenses in excess of the normalized allowed level . . . within a reasonable limit." With this evidence before it, the Commission's determination that it did not approve reserve accounting for storm expenses cannot be considered arbitrary. We therefore affirm on this issue.[3]

---

[3] Our ruling should not be read to say that the Commission is prohibited from approving a reserve method or other method to account for storm-restoration costs, or that

## B. Blytheville Turbine Costs

In 1974, Entergy entered into a twenty-five-year lease of the Blytheville Turbine. Following the lease's expiration in 1999, Entergy incurred certain costs, which it attributed to removing the asset from its books. An Entergy witness testified that Entergy did not "expense" the removal costs but instead charged them to a capital account, resulting in a "regulatory asset," for which it could seek recovery in a future rate case. *See* 2 Leonard Goodman, *The Process of Ratemaking* 742-43 (1998). Entergy sought to include the costs in its revenue requirement in this case, but the Commission disallowed the costs. We cannot say that the Commission acted arbitrarily.

■ According to Entergy, the removal costs were capitalized in 2001 in connection with an earnings review, and the PSC Staff concurred in the capitalization treatment at that time. However, the Commission rejected Entergy's inference "that Staff's lack of objection to capitalization of this expense . . . provides assurance of future Commission approval of prospective rate treatment in a general rate case." The Commission ruled that it was Entergy's choice to capitalize the expenses and that, if Entergy had wanted the Commission to consider the costs as a future regulatory asset, it should have petitioned for such approval. Additionally, a PSC Staff witness testified that the Blytheville costs were non-recurring from six years earlier and should not be recovered from future ratepayers. The Commission agreed, ruling that the costs were "non-recurring and clearly out-of-period" and were "more appropriately deemed to be an expense and, thus, should have been recognized in the year incurred." As the trier of fact in rate cases, it is the Commission's function to decide on the credibility of the witnesses, the reliability of their opinions, and the weight to be given their testimony. *Sw. Bell Tel. Co. v. Ark. Pub. Serv. Comm'n*, 69 Ark. App. 323, 13 S.W.3d 197 (2000). The Commission was within its authority to rely on the PSC Staff witness.

---

the Commission cannot permit recovery of past, extraordinary storm expenses. We simply hold that, given the circumstances of this case and our limited review of PSC orders, the Commission's decision was not arbitrary.

## C. Director and Officer (D&O) Liability Insurance

Entergy proposed to recover the cost of D&O liability insurance premiums from its customer base rates. This type of insurance protects a corporation's directors and officers from loss in the event of a claim made against them in their official capacity. 9A Lee Russ & Thomas Segalla, *Couch on Insurance* § 131:31 (3d ed. 2005). An Entergy witness testified that the insurance was a legitimate expense and that it encouraged qualified individuals to serve as directors and officers. However, a PSC Staff witness and the Attorney General's witness testified that ratepayers and shareholders should share the cost of the insurance because shareholders were the major beneficiaries of a payout on D&O insurance. The Commission ruled that the cost of premiums would be split fifty-fifty between shareholders and ratepayers.

Entergy now contends that the Commission's decision was arbitrary. It argues that D&O insurance is a prudent and necessary cost of doing business and should therefore be included in its rates. The Commission obviously agreed with Entergy to an extent. However, the Commission relied on testimony from the PSC Staff and the Attorney General, who said that part of the expense should be borne by shareholders as the primary beneficiaries of insurance. The Commission gave credence to these witnesses' testimony, as it was entitled to do. *Sw. Bell Tel. v. Ark. Pub. Serv. Comm'n*, 69 Ark. App. 323, 13 S.W.3d 197 (2000). Accordingly, we decline to interfere with the Commission's wide discretion in its approach to rate regulation on this point. *Consumer Utils. Rate Advocacy Div., supra*.

## D. Employee Incentive Compensation

Entergy also asked to include the cost of employee incentive compensation as part of its operating expenses. The Commission allowed incentives that were tied to operating performance but permitted only half the cost of incentives that were tied to the company's financial performance, and none of the costs that were tied to the stock performance of the parent company, Entergy Corp. Entergy argues that the disallowances were arbitrary because the incentives were not shown to be excessive and were a prudent cost of doing business.

Entergy witnesses did testify that incentives promote efficiency; are a reasonable cost of operation; are common in the industry; and attract and retain talented employees. However, the

Attorney General's witness testified that it is not good public policy to include one hundred percent of incentives in rates because, if employees earn their bonuses, shareholders are doing well and can afford to pay them. If they do not earn their bonuses, but one hundred percent of them are included in rates, shareholders are cushioned. He also said that the benefits of good performance flow to shareholders. A PSC Staff witness likewise recommended that the cost of incentives be split between ratepayers and shareholders, saying that predominantly financial incentives benefit ratepayers and shareholders equally. The Commission, citing this testimony, split the cost of financial incentives between shareholders and ratepayers and found no evidence that ratepayers would benefit from incentives tied to the performance of Entergy Corp. stock.

■ In its order, the Commission went to great lengths to analyze the testimony of all witnesses on this point and accepted the testimony of the Attorney General and Staff witnesses regarding a need for apportionment of the incentive costs. *See Associated Nat. Gas Co., supra.* We therefore decline to hold that the Commission acted arbitrarily. Further, we defer to the Commission's expertise in declaring that a legitimate operational expense should have a "direct ratepayer benefit" before being included in rates. *See generally Sw. Bell Tel. v. Ark. Pub. Serv. Comm'n,* 18 Ark. App. 260, 715 S.W.2d 451 (1986) (holding that we defer to the Commission's expertise; that a specific finding of bad faith or imprudence is not a necessary predicate to the disallowance of costs; and that the Commission may determine whether expenses are reasonably necessary in providing utility service to ratepayers).

### IV. Cost-Recovery Riders

In addition to recovering its costs from customer base rates, a utility may retrieve costs through a cost-recovery rider. This charge may appear as a separate line item on a customer's utility bill and is earmarked to cover a particular expense borne by the utility. For example, Entergy utilizes an ECR rider for exact recovery of fuel costs.

In this case, Entergy asked the Commission to implement another rider to allow exact recovery of payments it is legally bound to make under a Federal Energy Regulatory Commission (FERC) ruling. In 1985, the FERC determined that a System Agreement, which governed Entergy Arkansas and its sister com-

panies in other states, required a "rough equalization" of production costs among the companies. In 2001, the Louisiana Public Service Commission claimed that Entergy Arkansas's cost were too low and not roughly equal with those of the other companies. The FERC agreed and required Entergy Arkansas to subsidize some of the other companies' expenses beginning in 2007. It is estimated that the cost to Entergy Arkansas will be at least $265 million annually. The Arkansas PSC challenged the FERC's ruling, but the ruling was upheld by a federal appeals court. *See La. Pub. Serv. Comm'n v. Fed. Energy Reg. Comm'n,* 522 F.3d 378 (D.C. Cir. 2008). Entergy Arkansas has given notice that it will withdraw from the System Agreement, but the withdrawal will not take place until approximately December 2013. In the meantime, Entergy Arkansas is liable for the cost-equalization payments.

In the current case, the Commission implemented a PCA rider to allow exact recovery of the equalization payments. It also continued usage of the ECR rider. However, the Commission gave both riders a limited approval, through December 31, 2008, subject to the implementation of an Annual Earnings Review (AER), which the Commission directed the parties to expeditiously develop. The Commission also stated that its decision to continue the riders through 2009 would be influenced by Entergy's progress toward an amended System Agreement and the continuation of its notice to withdraw from the present Agreement.

Thereafter, a separate docket, No. 07-129-U, was apparently opened to implement the AER and for other purposes. However, the parties could not agree on the AER logistics, so the Commission decided not to go forward with the process. The Commission also, via Docket 07-129-U, dispensed with its December 31, 2008 "sunset" of the riders. It decided instead that the riders would be subject to eighteen months' advance notice of termination.

Entergy now argues that there was no substantial evidence to support the Commission's conditional approval of the riders. We observe first that the issue is very likely moot, given the Commission's modifications of its rulings in Docket 07-129-U. We do not review issues that are moot; to do so would be to render an advisory opinion. *Honeycutt v. Foster,* 371 Ark. 545, 268 S.W.3d 875 (2007). However, even if the issue is not moot, we conclude that reversal on this point is not warranted. Entergy appears to argue that, for the Commission to impose conditions on a utility,

there must be witness testimony that such conditions are required. Clearly, the Commission has greater discretion and flexibility in carrying out its duties. Here, the Commission agreed to the use of riders, which operated to Entergy's great advantage. But, the Commission was naturally concerned about how ratepayers and the utility would fare under the riders' implementation, particularly the new PCA Rider. It therefore instituted a trial period, accompanied by an Annual Earnings Review and a warning that it expected Entergy to maintain its withdrawal notice from the System Agreement. Entergy offers no persuasive argument why these conditions were unreasonable, especially given that the Commission was not bound to approve riders at all.

Entergy also asserts that the Commission erred in the amount of a carrying charge imposed in relation to the riders. The PCA Rider allows Entergy to recover the annual cost-equalization payments from its customers over twelve months. However, Entergy's payment obligations under the FERC ruling are spread over a shorter, seven-month period. This means that, for a portion of the year, Entergy is effectively advancing money to its customers for the PCA Rider payments. The Commission agreed that Entergy was entitled to a carrying charge to compensate it for the monies advanced, and it chose the same rate of interest used on customer deposits, about four percent. Entergy claims that the carrying charge should have been 5.58%, which is its overall rate of return on capital.

Through use of the riders, Entergy enjoys an automatic recovery of certain costs, as opposed to the mere "opportunity" to recover its costs from the ordinary rate base. As there is no risk involved with the riders, a carrying charge that mirrors Entergy's overall rate of return, which *does* include the element of risk, would, as the Commission determined, be incorrect. The Commission also cited testimony from Staff witnesses, who said that four percent was the reasonable carrying charge, or even that no carrying charge was necessary. Under these circumstances, we decline to reverse the Commission.

## V. Rate of Return

A utility is entitled to recover the cost of financing its plant and working capital. It may therefore charge rates sufficient to permit it to recover a reasonable rate of return. *See Alltel Ark. v. Ark. Pub. Serv. Comm'n*, 76 Ark. App. 547, 69 S.W.3d 889 (2002).

In calculating the utility's cost of financing (cost of capital), expert witnesses look to the company's capital structure, which primarily consists of the percentage of common stock, preferred stock, and debt. The ratio of debt to equity (called the D/E ratio) is used to determine the overall cost of capital. *See generally Sw. Bell Tel. Co. v. Ark. Pub. Serv. Comm'n*, 24 Ark. App. 142, 751 S.W.2d 8 (1988). In instances where the utility's capital structure is unsound or out of step with industry standards, a regulatory commission may calculate the cost of capital based not on the utility's actual capital structure but on a hypothetical capital structure. *See Walnut Hill, supra*.

In the present case, Entergy's projected capital structure was 44/56 debt-to-equity. According to witnesses, the company was equity-heavy (and thereby costlier to finance), and the ratio represented a significant departure from comparable companies' as well as Entergy's own prior D/E ratios. The Commission therefore used a hypothetical D/E ratio of 52/48, as recommended by the PSC Staff and the Attorney General, to establish the cost of capital. Entergy now argues that the Commission miscalculated the D/E ratio because it used actual figures for some components and hypothetical figures for others.

According to Entergy, the hypothetical ratio recommended by the PSC Staff and the Attorney General was based on a sample of ratios from comparable utilities. Entergy complains that, while the Commission used these samples to establish the hypothetical D/E ratio, it incongruously used Entergy's actual, four percent preferred-stock figure as part of the capital structure. Entergy cites *Southwestern Bell Telephone Co. v. Arkansas Public Service Commission*, 19 Ark. App. 322, 720 S.W.2d 924 (1986), for its statement that, when the Commission selects a particular method advocated by an expert witness, the methodology selected should be applied in a manner consistent with the rationale and theory underlying the methodology. In that case, we reversed the Commission for using a calculation that, in computing a utility's cost of capital, mixed Arkansas-only figures with total-company figures.

Entergy does not adequately explain to this court the relevance of the preferred stock percentage or why it affects the D/E ratio. In any event, use of a hypothetical capital structure should not foreclose the Commission's duty to utilize whatever reasonable figures, actual or hypothetical, it deems necessary in appropriately exercising its discretion, and the Commission is free, within the ambit of its statutory authority, to make the pragmatic

adjustments which may be called for by particular circumstances. *Walnut Hill, supra.* Further, we do not believe that a serious inconsistency exists here as it did in *Southwestern Bell Telephone Co. v. Arkansas Public Service Commission,* 19 Ark. App. 322, 720 S.W.2d 924 (1986). The Staff and the Attorney General in this case used numerous resources to arrive at the D/E ratio, and their efforts necessarily entailed some estimation and guesswork. *See Bryant v. Ark. Pub. Serv. Comm'n,* 50 Ark. App. 213, 907 S.W.2d 140 (1995) (recognizing that utility ratemaking is an inexact art and necessarily involves judgment calls and educated surmise from time to time). Thus, some level of mixed figures was unavoidable. Further, the Staff and Attorney General relied not only on comparable samples but on other resources to calculate the D/E ratio.[4] The fact that the witnesses used comparable samples as one tool did not require them to mirror all of the samples' aspects. Under these circumstances, we cannot say that the D/E ratio adopted by the Commission was arbitrary or unsupported by substantial evidence.

 Calculating the cost of capital also involves computing the cost of the individual debt and equity components. The cost of debt is readily ascertained by reference to the interest rates paid to creditors. However, the cost of equity (also called return on equity or ROE), reflects an investor's expected return and is generally calculated based on estimates provided by experts. The experts employ several formulas to compute a return on equity, and the Arkansas Public Service Commission primarily relies on the Discounted Cash Flow (DCF) method. The witnesses in this case utilized that method and others to arrive at return-on-equity figures ranging from 9.5% to 11.25%. The Commission established a ROE of 9.9%.

Entergy argues that the 9.9% ROE allowed by the Commission was not supported by substantial evidence because the Commission embraced the DCF method to the exclusion of all others. This is incorrect. The Commission discussed its primary reliance on the DCF method, but it also exhaustively discussed several other methodologies and noted the effect of reasonableness checks based on those methods. Additionally, the PSC Staff witness,

---

[4] In addition to samples from comparable companies, witnesses relied on Entergy's own historical D/E ratios and the ratios of the parent corporation.

whose ROE recommendation of 9.9% the Commission accepted, testified that she used other methodologies for reasonableness checks as well.

 Entergy further asserts that the Commission erroneously premised its ROE decision on the notion that the risk of investing in Entergy was reduced by the use of automatic adjustment clauses, or riders, which allow a utility to recover certain exact costs. The PSC Staff witness and Entergy's own expert testified that riders mitigate a utility's risks of operation. However, Entergy asserts that, even if a reduced risk exists, it is offset by the increased risk necessitated by the Commission's ruling on the rider carrying charge. On this point, it is sufficient to say that we defer to the Commission's discretion and expertise and that our concern is not with the Commission's methodology but the total effect of the rate order, which we find to be fair, reasonable, and based on substantial evidence. *See Bryant v. Ark. Pub. Serv. Comm'n*, 57 Ark. App. 73, 941 S.W.2d 452 (1997).

Entergy also argues that the Staff's calculations involving the DCF method were flawed. Entergy's expert testified that the DCF formula must be adjusted to account for quarterly payment of dividends rather than annual payments. The PSC Staff witness testified that she made the necessary adjustments, but Entergy asserts that she did so incorrectly. We see no basis for reversal. Staff's calculations yielded a *range* of 9.6% to 10.2%, for which the 9.9% figure adopted by the Commission was the mid-point. It is therefore difficult to say what effect Staff's alleged miscalculation had on the ultimate computation. Further, the Staff witness testified that her DCF calculations were supported by other methodologies. Thus, even if she erred in her DCF computation, her error was very likely negligible, given that other methodologies produced similar results. Additionally, other witnesses recommended returns on equity similar to Staff's.

## VI. Working Capital

Working capital is part of a utility's rate base on which a return is allowed. It includes the cash and other non-plant investment in assets that a utility must maintain in order to meet its current financial obligations and provide utility service to its customers in an economical and efficient manner. *Associated Nat. Gas Co., supra.* No particular methodology is precise in calculating working capital, and a determination of working capital is in many

respects an exercise of discretion as to what particular method yields the most fair and equitable result in each case. *See Gen. Tel. Co. of Sw. v. Ark. Pub. Serv. Comm'n*, 23 Ark. App. 73, 744 S.W.2d 392 (1988), *aff'd*, 295 Ark. 595, 751 S.W.2d 1 (1988). The particular amount of working capital allowance, along with the particular methodology used to derive that amount, is a matter of educated opinion, expertise, and informed judgment of the Commission and not one of mathematically demonstrable fact. *Id.*

In calculating the value of working capital, the Commission employs the Modified Balance Sheet Approach, in which values are assigned to the utility's assets and liabilities. In this case, Entergy argues that the Commission erred in its treatment of two asset components — coal inventory and undistributed stores expense — and four liability components: dividends payable, unfunded pension liability, storm reserve account, and transmission reserves.[5]

### A. Coal Inventory

Entergy asked the Commission to adopt its method of valuing coal inventory, which was a forty-three-day average operational inventory level called the Coal Inventory Policy. The Commission did so "under the assumption that this level will be maintained prospectively, representing an average, normal level." It ordered Entergy to maintain an "average operational supply" and stated that failure to do so would be deemed imprudent. Entergy petitioned for rehearing, arguing that the Commission had ordered it to fix an absolute coal inventory level, despite the fact that such levels would naturally require adjustment. The Commission denied rehearing, ruling that it approved the Coal Inventory Policy based on Entergy's representations that the company would actually maintain the expected level. The Commission stated further that, if Entergy needed to make adjustments, it could seek relief from the Commission.

Entergy argues on appeal that the Commission arbitrarily required coal inventory to be "static and absolute." We do not believe the Commission's order so states. The Commission

---

[5] Entergy makes the same argument regarding the storm reserve account in this section as it did in the previous section on costs. We need not address the issue again in this context, as our previously stated reasons for affirming the Commission's treatment of the storm account apply equally here.

was aware, through testimony from Entergy's witness, that use of the Coal Inventory Policy did not mean that there would always be "43 days of coal on the ground," given that inventory levels are cyclic, based on outages or peak burn periods. The Commission's order consequently required Entergy to maintain an "average normal level" and an "average operational supply as indicated in [Entergy's] approved Inventory Policy." Further, the Commission's order embodied Entergy's representation that the forty-three-day level was an appropriate target level for ratemaking purposes. The Commission simply gave notice that, in assigning a balance to coal inventory, it was holding Entergy to the representation.

### B. Undistributed Stores Expense

According to witnesses at the hearing, undistributed stores expense is the cost of housing materials, supplies, and other items pending their use on maintenance or construction projects. Witnesses also testified that the undistributed stores account is a temporary "clearing" account and that, once items in the account are assigned to a construction or maintenance project, the expenses associated with the project are moved to other accounts. They then become part of the value of physical plant or are accounted for as an operating expense.

Entergy proposed to include as an asset, for purposes of working capital, approximately $6.6 million of "undistributed stores expense." However, a PSC Staff witness testified that the amount should not be included in working capital assets because Entergy would receive a return on the materials in other ways, either as part of the physical plant after completion of construction or as an operational expense. The Commission relied on the Staff witness and did not include the undistributed stores expenses in calculating working capital.

Entergy argues that the Commission's decision was arbitrary and not based on substantial evidence. In particular, it claims that the Staff witness's testimony represents a misunderstanding of the stores accounting process. However, the Commission, in the exercise of its discretion and expertise, ruled to the contrary and accorded weight to Staff's opinion. Entergy has not convinced us that the Commission erred in doing so, and we therefore defer to the informed judgment of the Commission on this point.

Entergy also argues that, based on testimony from its witness, the undistributed stores balance should be included in working capital because the Commission authorized its inclusion in past dockets. Entergy's very limited argument does not warrant reversal, and we note that it cites no specific language from any prior order dealing with this type of account.

## C. Dividends Payable

In employing the Modified Balance Sheet Approach, PSC Staff characterized certain short-term liabilities as Current, Accrued, and Other Liabilities (CAOL). These liabilities are also called zero-cost liabilities because the utility has use of the money in the accounts for a short time, at no cost, before discharging the obligation of the liability. Among the items included by the PSC in this case as a zero-cost liability were dividends payable.

Entergy argues first that dividends payable should not be considered a zero-cost liability. However, it cites no testimony from its witnesses to this effect. In fact, according to the Commission, the only issue at the hearing was the amount of the payables balance, and our review of the hearing testimony bears this out. In any event, two PSC Staff witnesses explained that dividends payable should be included as a zero-cost liability, and the Commission had the latitude to accept their testimony. *See Assoc. Nat. Gas Co., supra. See also Contel of Ark. v. Ark. Pub. Serv. Comm'n*, 37 Ark. App. 18, 822 S.W.2d 850 (1992) (affirming the inclusion of dividend payables as a zero-cost liability).

Entergy also argues that the dividends-payable balance was miscalculated. To explain, a company has use of dividends payable in the lag time between the declaration of dividends and the payment of dividends to shareholders. Entergy Arkansas is not a publicly-traded company and does not declare dividends to any shareholders other than its parent corporation, Entergy Corp. Therefore, the lag time between declaration and payment is only a few days, which, if used to calculate working capital, would result in a low dividends-payable balance in favor of Entergy Arkansas. However, Entergy Corp. declares and pays dividends to its shareholders in a more traditional manner, with a lag time of over thirty days. The PSC Staff used the parent company's lag time to calculate working capital, which resulted in a greater payables balance, to Entergy Arkansas's detriment. A Staff witness testified that he used the parent company's lag time to reflect normal dividend-payment practices. We agree with Entergy Arkansas that

the Commission's use of the parent company's lag time was unsupported by substantial evidence in this case.

The precise value of dividends payable as a zero-cost liability is, unlike many of the mathematical values in this case, easily and accurately computed by reference to a fixed, objective amount: the number of days the utility holds the dividend funds before paying them. There was no evidence before the Commission that Entergy Arkansas's lag time was historically abnormal or that it significantly diverged from other, similarly-situated companies (as in the case of Entergy Arkansas's D/E ratio); rather, the evidence was that it diverged from that of a company with more stockholders, its parent company. This is therefore a situation in which theory should give way to reality. *See Contel, supra.* We can discern no rational basis for using a proxy lag time instead of Entergy Arkansas's actual lag time to calculate the value of dividends payable as a zero-cost liability.

The Commission explained its use of the parent company's lag time by saying that it calculated Entergy's cost of equity based on parent-company figures. However, we see no logical basis in the evidence why the practice of using parent-company numbers, among several other factors, to ascertain the cost of equity of a non-publicly traded company, *see Contel, supra,* should apply to the simple matter of determining how long Entergy Arkansas had use of the dividends payable before disbursing them. Moreover, in *Contel,* this court held that the Commission should use the precise lag time to calculate a dividends-payable balance. Accordingly, we reverse and remand on this issue with instructions to the Commission to recalculate working capital accordingly.[6]

## D. Unfunded Pension Liability

By the end of the test year in this case, Entergy had accumulated a large balance in a pension reserve fund, which it would eventually pay as pension expense. Shortly after the test year ended, Entergy disbursed $80 million from the account. As a result, an Entergy witness said, by the end of the pro-forma year in June 2007, the average balance for the account was a debit

---

[6] We recognize that, in *Contel,* the dispute concerned the value of dividends payable in the parent company's capital structure. However, the basic rationale of *Contel* applies here.

(negative) balance of $17.4 million. The witness testified that the negative balance should be included on the liability side of the balance sheet. However, a PSC Staff witness testified that the negative $17.4 million was not representative of the account's normal level. He said that the account had ordinarily reflected a credit (positive) balance of $20 million to $70 million between 2002 and 2005. He consequently recommended an average credit balance of approximately $30.1 million be assigned to the pension reserve account. The Commission did so, ruling that all components used in ratemaking should reflect an expected, normal level. On rehearing, the Commission stated that it relied on the Staff's "use of a standard and wholly appropriate method to set rates which rejects aberrant account balances and replaces them with the expected, representative, or normal levels for those accounts."

▪▪▪ Entergy argues that, because a negative balance actually existed in the pension reserve account in 2006-07, Entergy should have the benefit of that balance, which would eliminate the account as a zero-cost liability. However, the Commission approved the approach used by the Staff witness, who established an average balance based on Entergy's past figures rather than one or two transactions. Understandably, the Commission did not want to set rates based on unusual accounting entries made during the pro-forma year. We therefore decline to reverse on this point.

### E. Transmission Reserves

The PSC Staff witness included certain funds in CAOL relating to a transmission reserve account. The Commission approved the inclusion, which Entergy argues is the result of a "technical error."

An Entergy witness testified that the reserve amount included by Staff was related to an eliminated expense account and, therefore, the reserve amount should have been eliminated as well. However, the PSC Staff witness explained in detail why no error occurred, and the Commission exercised its prerogative in relying on his testimony. *See Associated Nat. Gas Co., supra.* We therefore find no error.

### VII. Billing Determinants

To predict a utility's revenues for purposes of a rate case, it is necessary to calculate billing determinants by ascertaining the number of customers and the amount of their usage during the test

year and the pro-forma year. Inappropriate calculation of billing determinants can result in over- or under-collection of revenues. *Bryant v. Ark. Pub. Serv. Comm'n,* 50 Ark. App. 213, 907 S.W.2d 140 (1995).

In this case, Staff's calculation of billing determinants, as adopted by the Commission, was considerably higher for the pro-forma year than Entergy's calculation. Entergy's witness computed the pro-forma year figures by simply applying, to each pro-forma month, the amount that appeared in the last month of the test year. In short, Entergy predicted no reasonably known and measurable customer growth in the pro-forma year. By contrast, the Staff witness viewed data from several years preceding the test year to conclude that there was historical growth, which would continue into the pro-forma year. The Attorney General basically concurred with Staff's approach.

The Commission ruled that "the five year measure of growth impacts, using [Staff's] model, more reasonably measures and more accurately reflects expected growth than does [Entergy's] method, which takes the customer count from one isolated month and simply multiplies it by twelve." On appeal, Entergy argues that revenue growth in the pro-forma year was not reasonably known and measurable, as required by Ark. Code Ann. § 23-4-406 (Repl. 2002).

Where the Commission has cited reliable data, supported by substantial evidence, we have affirmed its determination that a particular revenue adjustment was reasonably known and measurable. *Bryant v. Ark. Pub. Serv. Comm'n,* 50 Ark. App. 213, 907 S.W.2d 140 (1995); *Sw. Bell Tel. Co. v. Ark. Pub. Serv. Comm'n,* 18 Ark. App. 260, 715 S.W.2d 451 (1986). Here, the Commission was presented with several years of historical figures by the PSC Staff. The Commission deemed the information a reliable measure of future revenue growth, and, in fact, superior to Entergy's method of multiplying one month's figure times twelve. We decline to invade the Commission's wide discretion on this matter.

Entergy argues alternatively that, if the pro-forma revenue adjustment is allowed to stand, Entergy should be allowed to increase its capacity costs to support the level of growth. The Commission rejected this idea, ruling that all costs had been updated to reflect known and measurable levels. Given the Com-

mission's reasoning and our limited standard of review, we are unwilling to reverse on this basis.[7]

## VIII. Effective Date

The Commission declared that Entergy's rates, as established in Order No. 10, would be effective "for all bills rendered after June 15, 2007," which was the date the Commission issued Order No. 10. Entergy argued that the effective date should be delayed to "the first billing cycle following approval of those tariffs." The Commission declined to alter the effective date of its order.

Entergy cites Ark. Code Ann. § 23-4-202, which generally requires a utility to render bills in accordance with duly filed rate schedules. However, the Commission relied on Ark. Code Ann. § 23-4-410, which reads in part:

> Until rate schedules in compliance with the commission's order can be filed and approved, any rate increase allowed in the commission's order shall be apportioned among all classes of customers and *shall become effective on all bills rendered thereafter through a temporary surcharge or other equitable means, as shall be prescribed in the order.*

(Emphasis added.) This statute pertains to effective dates of rate increase, and the present case involves a rate decrease. However, Entergy presents no persuasive argument why the Commission should not apply the statute's basic notion of a rate change becoming effective prior to rate schedules being filed. Entergy argues that it could face certain logistical difficulties in immediate implementation of the decrease, but the Commission noted that those difficulties could be met by utilizing appropriate debits or credits to customer bills. Under these circumstances, we affirm the Commission's decision on the effective date of its order.

## IX. Conclusion

For the reasons stated in this opinion, we reverse and remand the Commission's orders in part for recalculation of working capital in light of our ruling on dividends payable. We affirm the remainder of the Commission's orders.

---

[7] Entergy also contends, as it has on other issues, that the Commission's decision in this case differs from its decisions in prior rate cases. However, ratemaking is a legislative function, and res judicata has little application; any rate order may be superseded by another. *Consumer Utils. Rate Advocacy Div. v. Ark. Pub. Serv. Comm'n*, 86 Ark. App. 254, 184 S.W.3d 36 (2004).

Affirmed in part; reversed and remanded in part.

PITTMAN, C.J., and HART, ROBBINS, VAUGHT, and BAKER, JJ., agree.